**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| SONYA P. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:17-cv-02050-TLP-egb |
| v. | ) | |
| | ) | JURY DEMAND |
| SHELBY COUNTY BOARD OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT**

Defendant moves for summary judgment on all of Plaintiff's claims. (ECF No. 42.)

Plaintiff has responded (ECF No. 46, 76), thus the Motion is ripe. For the reasons below, the

Court GRANTS IN PART AND DENIES IN PART Defendant's Motion.

## BACKGROUND

Plaintiff began working for Memphis City Schools ("MCS") as a family and consumer

sciences teacher in 2002. (ECF No. 46-1 at PageID 299.) She became a tenured teacher in

2006.[1] (*Id.*) Later, Plaintiff applied for a position as a family and consumer sciences advisor,

but did not received the job. (*Id.* at PageID 300.) She then filed a claim in 2013 with the

EEOC alleging age and race discrimination. (*Id.*) The EEOC negotiated a settlement of the

claim in August 2015, resulting in Plaintiff receiving a position as an Adult Education

Advisor in the Adult Education Program ("AEP") of the Shelby County Schools System

---

[1] Memphis City Schools and the Shelby County Board of Education merged into one school
district in 2013. (ECF No. 42 at PageID 122.)

("SCS"). (*Id.*) Chantay Branch, Director of Employee Relations, contacted Dr. Joris Ray, Assistant Superintendent for Academic Operations and School Support, to secure the position for Plaintiff. (*Id.* at PageID 300–01.) Ray did not know that Plaintiff was receiving the position as part of the EEOC settlement agreement. (ECF No. 46-1 at PageID 301.)

At the beginning of the school year in 2015, Plaintiff began her role as an advisor at the Messick Adult Center. (*Id.*) An Adult Education Grant provided by the State of Tennessee funded both the AEP and Plaintiff's position. (*Id.* at PageID 303, 313.) When Plaintiff learned that her position was grant-funded, she allegedly sent an email voicing concern about the funding but otherwise she did not dispute her placement. (*Id.* at PageID 303.)

Plaintiff alleges that it did not take long for SCS employees to begin harassing her. She alleges that on her first day, Carol Miller, Director of Career and Technical Education, told Plaintiff that she "was glad the District [was] righting [its] wrong" and asked Plaintiff if she was being "compensated fairly" for her position. (*Id.* at PageID 304.) This interaction occurred in front of Rochelle Griffin, Interim Principal of Messick Adult Center. (*Id.*) Plaintiff was then allegedly harassed on September 9, 2015, when Griffin and Tawn King, Assistant Principal of Messick Adult Center, met with Plaintiff to discuss her tone, communication style, and global perspectives. (*Id.* at PageID 305.) At this meeting, Plaintiff acknowledges she got "loud," although she alleges that she was not excessively loud. (ECF No. 46-1 at PageID 306.) Plaintiff believes that those at the meeting intended to intimidate her and question her credentials. (*Id.* at PageID 307.) Plaintiff emailed Griffin the next day alleging harassment. (*Id.*) After receiving the email from Plaintiff, Griffin prepared a memorandum in which she summarized the meeting and informed Plaintiff that "I assured

you that the circumstances by which you took on the AE Advisor position would never be publicized by me." (ECF No. 42-5 at PageID 198.)

The harassment allegedly continued. Plaintiff contends that Griffin sought to derail her career and subvert her authority on at least two occasions. (*Id*. at PageID 308.) This led Plaintiff to email Ramone Lloyd, Employee and Labor Relations Advisor, to report the harassment and that she believed Griffin and Miller were retaliating against her for filing an EEOC claim. (ECF No. 46-1 at PageID 308–09.) About one month later, Griffin referred Plaintiff to Labor Relations for ongoing issues of insubordination. (*Id*.)

Around this time, Plaintiff also began reporting alleged testing fraud occurring at the AEP, among other misconduct, to visiting state officials. (*Id*.) The very next day, Plaintiff was made to meet with Branch and Lloyd to discuss the ongoing issues. (*Id*. at PageID 310.) Branch and Lloyd decided that Plaintiff should meet with Griffin to discuss their concerns. (*Id*.) The meeting was ultimately unsuccessful. (ECF No. 46-1 at PageID 311.)

Plaintiff then filed many complaints. First, she filed a whistleblower complaint with SCS alleging that SCS had provided false data to the state and was engaging in testing fraud. (ECF No. 46-1 at PageID 311.) Second, she filed an EEOC claim alleging retaliation. (*Id*.) The whistleblower complaint prompted a visit from state officials to interview Plaintiff about her allegations of fraud and other misconduct. (ECF No. 46 at PageID 273.) Plaintiff took this opportunity to inform state officials that Griffin "had a problem with change" and was an "interference" and "impediment" to progress. (ECF No. 46-1 at PageID 312.)

Unsurprisingly, Griffin did not appreciate these comments and issued Plaintiff a written reprimand; this time for "unethical conduct" related to her behavior during the meeting with state officials investigating her complaint. (*Id*. at PageID 312.) The reprimand

stated that "[Plaintiff's] behavior throughout both meetings seemed as though [Plaintiff] was attempting to sabotage the adult education program within Shelby County Schools." (*Id*.) Griffin then took a step further and referred Plaintiff to Labor Relations—her second referral in less than five months. (*Id*.) The referral stated that Plaintiff was "an ill-fit for the Adult Education Advisor position and [her] continued employment at Messick Adult Center [was] adverse to the entire Adult Education Program . . . ." (*Id*. at PageID 313.)

About one month later, the State of Tennessee terminated the Adult Education Grant that funded the AEP without cause. (ECF No. 46-1 at PageID 313.) This precipitated the closing of the entire AEP program, including the Messick Adult Center, and the termination of employees of the AEP program whose salaries depended on grant funding. (*Id*.) As a result, at least five full-time and forty part-time employees lost their positions in the SCS. (*Id*. at PageID 314.) Defendant later terminated Plaintiff without cause, but only after she received a negative evaluation from Griffin. Defendant also required Plaintiff to attend another disciplinary session with Labor Relations. (ECF No. 70-1 at PageID 2362.) It was Dorsey Hopson, Superintendent of SCS, who notified Plaintiff of her termination and who allegedly made the final decision to terminate her. (*See* ECF No. 60 at PageID 1780.) To date, Plaintiff has not acquired another position with the SCS.

Plaintiff has now filed a five count complaint alleging: (1) retaliation in violation of the First Amendment;[2] (2) violation of the Due Process Clause of the Fourteenth Amendment; (3) violation of the Tennessee Public Protection Act; (4) retaliation under Title VII of the Civil Rights Act of 1964; and (5) violation of Tennessee Teacher Tenure Act, Tenn. Code Ann. § 49-5-511(b). (ECF No. 1.)

---

[2] Plaintiff voluntarily dismissed her First Amendment prior restraint claim. (ECF No. 40.)

## STANDARD OF REVIEW

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In considering a motion for summary judgment, [a] court construes all reasonable inferences in favor of the nonmoving party." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). As for the burden of proof, "[t]he moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." *Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A moving party can support its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 325.)

What is a genuine issue of material fact? "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense." *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 776 (6th Cir. 2012). "A *genuine* issue for trial exists where reasonable minds could differ on a material fact." *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013) (emphasis added). There must be more than "some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is not 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita*, 475 U.S. at 586–87).

The burden of proof can shift to the nonmoving party. "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Mosholder*, 679 F.3d at 448–49; *see also* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587. Rule 56(e) "requires the nonmoving party [who

will bear the burden of proof at trial] to go beyond the pleadings" to show the existence of a genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 324. Conclusory allegations, unsupported by specific evidence, cannot establish a genuine factual dispute sufficient to defeat a motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 902 (1990); *see also* Fed. R. Civ. P. 56(e). Similarly, statements in an affidavit that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584–85 (6th Cir. 1992). Additionally, "a mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251 (1986)). "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012).

To show that a fact "cannot be or is genuinely disputed," each party must cite "particular parts of materials in the record" or show that the materials cited by other party do not establish the presence or absence of a genuine factual dispute. Fed. R. Civ. P. 56(c)(1); *see also Bruederle*, 687 F.3d at 776. Simply put, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In other words, "the district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Pharos Capital Partners, L.P. v. Deloitte & Touche*, 535 F. App'x 522, 523 (6th Cir. 2013) (per curiam) (quoting *Tucker v. Tennessee*,

539 F.3d 526, 531 (6th Cir. 2008), *abrogation recognized by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015)).

## ANALYSIS

### I.     First Amendment Retaliation Claim

Plaintiff first claims that she was terminated from her employment with SCS in retaliation for exercising her First Amendment right to speak on matters of public concern. (ECF No. 1 at PageID 2.)  The Sixth Circuit uses a burden-shifting framework to evaluate First Amendment retaliation claims, where the employee must first establish a prima facie case of retaliation.  *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). This requires the employee to show that:

> (1) [she] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [her] protected conduct.

*Id*.  (quoting *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). An employee engages in constitutionally protected speech when the employee speaks as a private citizen and if the speech touched on matters of public concern.  *Keeling v. Coffee Cty., Tenn.*, 541 F. App'x 522, 526 (6th Cir. 2013).

Upon the establishment of a prima facie claim, the burden then shifts to the employer to show "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct."  *Id*. (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)).  "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant."  *Id*. at 294–95 (quoting *Eckerman*, 636 F.3d at 208).

Defendant asserts that Plaintiff cannot establish that she engaged in constitutionally protected speech or that there is a causal connection between her termination and her speech. (ECF No. 42-1 at PageID 130.)  In brief, Defendant alleges that: (1) Plaintiff's was speaking under her official duties, not as a private citizen; and (2) Plaintiff was terminated because of a cut in funding, not because of her speech.  (*Id*. at PageID 130–34.)

A.    **The First Amendment Does Not Protect Speech on Matters Concerning Employment.**

The First Amendment protects a public employee's right to speak as a private citizen on matters of public concern.  *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).   Yet an employee's right to speak is not unlimited.  For example, a government employer is well within constitutional bounds to limit an employee's speech on matters about her employment.  *Id*.  Thus, the constitution protects a public employee's speech only if it meets these three requirements:

> (1) it touches on 'a matter of public concern;' (2) it is not uttered pursuant to the employee's 'official duties' but rather 'as a citizen;' and (3) the employee's interest in the speech outweighs the government's interest in promoting "the effective and efficient fulfillment of its responsibilities to the public."

*Housey v. Macomb Cty.*, 534 F. App'x 316, 321 (6th Cir. 2013) (citations omitted).

When "a public employee speaks pursuant to her official duties, then she was not speaking as a citizen, and the First Amendment will 'not insulate [her] communications from employer discipline.'"  *Keeling*, 541 F. App'x at 526 (quoting *Garcetti*, 547 U.S. at 417) (alteration in original).  Courts are to look at the "impetus for the speech, the setting of the speech, the speech's audience, and its general subject matter" to determine the type of the speech.  *Id*. (quoting *Handy-Clay*, 695 F.3d at 540).  While the fact that the speech "owes its existence to a public employee's professional responsibilities" is an important factor, the main consideration is whether the employee made the speech in furtherance "of the ordinary

8

responsibilities of [her] employment." *Boulton v. Swanson*, 795 F.3d 526, 533–34 (6th Cir. 2015) (citing *Lane v. Franks*, 134 S. Ct. 2369 (2014)).

For example, in *Keeling*, the Sixth Circuit held that a government employee was speaking as a public employee and not a private citizen when she complained about her supervisor's work schedule to the county mayor, because "her speech pertained to her employment—her and her supervisor's ability to properly assist members of the public who came to the Codes Department—and was made up the chain of command." 541 F. App'x at 527. The plaintiff in that case was the Permits Clerk in the Coffee County Codes Department. *Id*. at 523. Her speech, made to the county mayor, concerned her supervisor's frequent absences and ongoing complaints from tax payers who sought out the supervisor's services but were unable to receive help because the supervisor was never present. *Id*. at 524–27. The Sixth Circuit found that the plaintiff was not speaking as a private citizen because her speech concerned her and her supervisor's ability to execute their jobs and the plaintiff made the complaint to a superior. *Id*. at 527. The court decided that her speech was "nothing more than 'the quintessential employee beef: management has acted incompetently.'" *Id*. (quoting *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir. 2007)). The court also found that "even if [the plaintiff]'s speech was not required by her employment or set forth in her employment duties, the speech still owed its existence to her duties as a public employee." *Id*. at 528. The court found, therefore, that the First Amendment did not protect the speech.

In another case, the Sixth Circuit held that a government employee spoke as an employee rather than a private citizen on matters of judicial and attorney misconduct. *Housey v. Macomb Cty*, 535 F. App'x 316, 322 (6th Cir. 2013). As a probate court

employee, his job duties included performing case-management functions and ensuring compliance with court policies and his speech concerned the execution of those duties. *Id*. *Housey* concerned a plaintiff who worked as the probate court register. *Id*. at 318. His job duties entailed overseeing the "overall administrative functions" of the probate court as well as ensuring compliance with case-management policies and procedures and reporting issues and recommending corrective actions for those issues. *Id*. The plaintiff began reporting both judicial misconduct and violations of the court's policies and procedures. *Id*. at 318–19. Plaintiff was eventually terminated and he sued alleging that he was being retaliated against for exercising his First Amendment right to free speech. *Id*. at 319–20. The circuit court affirmed summary judgment on his claims because, among other reasons, his speech "arose from his duty to oversee the efficient administration of the [probate court] . . . ." *Id*. at 323.

On the other hand, in *Handy-Clay v. City of Memphis*, the Sixth Circuit held that dismissal of the plaintiff's claims was not appropriate when the plaintiff, a city employee, reported misconduct occurring by employees at the city attorney's office, because the reporting was not part of her job and her speech was "extraordinary rather than everyday communication." 695 F.3d 531, 542 (6th Cir. 2012). In *Handy-Clay*, the plaintiff was a public records coordinator for the City of Memphis, whose duties included facilitating public records requests and preventing the release of confidential information. *Id*. at 535–36. When records requests made to the city attorney's office began being delayed, the plaintiff received complaints from would-be recipients. *Id*. at 536. The plaintiff reported these delays along with other allegations of misconduct by employees of the city attorney's office. *Id*. The allegations of other misconduct included the plaintiff's belief that city employees were abusing the city's leave policies by not reporting when they were absent from the office. *Id*.

at 536–37. She was ultimately terminated after she filed an open records request to the city attorney's office for documentation about time sheets and payroll. *Id*. at 537. The Sixth Circuit held that her speech on the delay in production of public records failed to state a claim for First Amendment retaliation because they were "directly related to her alleged job responsibilities . . . ." *Id*. at 541–42. That said, the speech over the other misconduct occurring at the city attorney's office sufficiently alleged a claim for First Amendment retaliation because it did not involve matters within her job duties and was thus speech as a private citizen. *Id*. at 542.

The Court must now determine whether Plaintiff was speaking as a government employee or a private citizen when she reported her allegations of testing fraud and other misconduct occurring at the AEP.

**B.      The First Amendment Does Not Protect Plaintiff's Speech.**

Plaintiff claims that she was terminated because she reported ongoing testing fraud and grant money misappropriation to state and local officials. (ECF No. 46 at PageID 291.) These allegations were discussed with state officials at a meeting about the AEP. (ECF No. 46-1 at PageID 309–310.) Plaintiff's whistleblower claim concerned the same activities. (*Id*. at PageID 309–11.) Defendant argues that Plaintiff had a duty to report these issues as part of her job. (ECF No. 42-1 at PageID 131.) In support, Defendant alleges that Plaintiff's job duties included "[e]nsuring delivery of the state approved curriculum and instructional standards . . . and that the execution of the responsibilities are in accordance to the lawful and ethical standards." (*Id*.) On the other hand, Plaintiff claims that she exceeded the scope of her employment in reporting these activities, including reporting to state officials, and thus was speaking as a private citizen on matters of public concern. (ECF No. 46 at PageID 292.)

Plaintiff's reports of fraud related to the "delivery of the curriculum" and the "execution of responsibilities" of the AEP. Plaintiff had an obligation to make sure that the AEP carried out these duties in "accordance with lawful and ethical standards." First, she reported her allegations up the SCS chain of command by filing her whistleblower complaint. (*See* ECF No. 46-1 at PageID 311.) Courts have found that type of speech to constitute unprotected speech related to the plaintiff's employment. *See Fox v. Traverse City Area Public Schs. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010) (holding that a teacher's statements to her supervisors did not qualify for First Amendment protection). Second, while reporting such allegations to state officials may not have been a technical part of her job, the "ad-hoc" or "de facto" duty to report developed when state officials visited the AEP to observe the organization. *See Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007) (finding that a park ranger had an "ad hoc" or "de facto" duty to speak with a third-party consultant who was evaluating the department). Plaintiff claims that these "external communications" take her report out of the realm of employment speech and into the protections of private speech. (ECF No. 46 at PageID 294.) Yet the speech in *Wesibarth* was to a third-party consultant hired by the plaintiff's employer. 499 F.3d at 539–40. Here, the speech was to a state official overseeing the grant program for the department where Plaintiff worked. If communications to a third-party consultant constitute unprotected employment speech, so does speech to a government official overseeing the grant program funding the AEP.

Plaintiff's case differs from *Handy-Clay* because her reporting was not about matters outside her official job duties. Additionally, this case differs from *Boulton*, where the Sixth Circuit held that a union member's testimony at an arbitration proceeding was private speech

because the employee's job responsibilities did not include acting as a union member. Here, unlike *Boulton*, Plaintiff's speech does not involve participation in union activities or activities outside her official duties. *See* 795 F.3d at 534. Instead, Plaintiff's speech is more like that in *Keeling* and *Housey* because her speech arose from her job and she reported fraud to advance the ordinary responsibilities of her employment. Plaintiff's speech is therefore unprotected by the First Amendment.

Plaintiff has failed to establish a prima facie case of retaliation under the First Amendment. There is thus no genuine issue of fact as to Plaintiff's First Amendment claim and Defendant is entitled to judgment as a matter of law.

## II.    Fourteenth Amendment Due Process Claim

Plaintiff next alleges under 42 U.S.C. § 1983 that Defendant deprived her of her property interest in continued employment without due process of law in violation of the Due Process Clause of the Fourteenth Amendment. (ECF No. 1 at PageID 2.) To establish a prima facie due process claim, Plaintiff must establish that Defendant deprived her of a constitutionally protected property interest without adequate process. *Upshaw v. Metro. Nashville Airport Auth.*, 207 F. App'x 516, 518 (6th Cir. 2006). "A protected property interest is defined by the terms of the state document creating the interest." *Kelley v. Shelby Cty. Bd. of Educ.*, Nos. 17-6070/17-6141/17-6152, 2018 WL 4628625, at *5 (6th Cir. Sept. 26, 2018). Tenured teachers have a constitutionally protected property interest in continued employment and the school board must afford due process before the teacher is terminated. *Kelly v. Shelby Cty. Bd. of Educ.*, 198 F. Supp. 3d 842, 854 (W.D. Tenn. 2016) (citing *Thompson v. Memphis City Sch. Bd. of Educ.*, 395 S.W.3d 616, 627 (Tenn. 2012)), *aff'd*, 2018 WL 4628625 (6th Cir. Sept. 26, 2018). Even so, where a property right in continued

employment is created by state law, and state law allows the position to be eliminated because of a legitimate reduction in force, the Due Process Clause does not prevent a reduction in force. *Id.* (citing *Upshaw*, 207 F. App'x at 519); *see also Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 769 (6th Cir. 2004) (holding that a government employee has no constitutional right to continued employment when the government eliminates her position and that termination is not based on cause). "A 'legitimate reduction in force' is one conducted pursuant to an actual reorganization, as opposed to one that is a mere sham calculated to circumvent due process protections." *Kelly*, 198 F. Supp. 3d at 854.

Defendant claims that Plaintiff does not have a protected property interest in tenure status under Tennessee Code Annotated § 49-5-501(11)(B)(i),[3] and, even if she does, her position may be eliminated because of a legitimate reduction in force. (ECF No. 42-1 at PageID 135–36.) Plaintiff responds that Defendant conducted a "sham" reduction in force, which violates the Due Process Clause. (ECF No. 46 at PageID 281.) As evidence of this sham reduction in force, Plaintiff states that there were open positions within the school system for which Plaintiff was qualified and had applied. (*Id.*) And Plaintiff's name is missing from a list of employees impacted during the 2015-2016 reduction in force. (*Id.*) Plaintiff also states that legitimate reductions in force can only occur when it is necessary to reduce the number of teaching positions in the entire system. (*Id.*)

First, Defendant may be correct that tenured teachers do not have a constitutionally protected property interest in their tenure status under Tennessee law, but they do have a protectable property interest in continued employment. *See Thompson*, 395 S.W.3d at 627

---

[3] "A teacher has no property right in the teacher's tenure status and must sustain a specified performance effectiveness level on evaluations, as provided in this part, to achieve and maintain tenure status." Tenn. Code Ann. § 49-5-501(11)(B)(i).

("A tenured teacher, like other public employees, possesses a constitutionally protected property interest in continued employment, and she cannot be deprived of this right without due process."). Although the State of Tennessee created a property interest in continued employment for tenured teachers, it also allows school boards to terminate those teachers when there is a reduction in "the number of teaching positions or nonlicensed positions in the system because of a decrease in enrollment or *for other good reasons* . . . ." Tenn. Code Ann. § 49-5-511(b)(1) (emphasis added). There is no requirement that the termination be for cause when the position is eliminated for a reduction in force. *See id.* Nor does due process prevent the Board from excising a teaching position when the position is eliminated as a result of a reduction in force, because the statute that creates the property interest specifically provides for such a reduction. *See Kelley*, 198 F. Supp. 3d at 854.

SCS eliminated both Plaintiff's position in the AEP Program and the AEP Program itself because of a loss of state funding. (ECF No. 46-1 at PageID 313–15.) The Court finds this constitutes "other good reasons" for a reduction in force. Plaintiff's argument that the reduction in force must be system wide to be legitimate is unconvincing. (*See* ECF No. 46 at PageID 281.) While the statute does use the phrase "in the system," Plaintiff cites no law to support her system-wide argument. The loss of the state grant which funded the AEP would seem to require reducing the number of positions "in the system."

Second, Plaintiff's argument that Defendant's elimination of her position in the AEP program, without affording her a new position, evidences an illegitimate reduction in force is similarly unavailing. It is true that Defendant cannot simply abolish teaching positions to avoid the general requirement that a teacher be dismissed only for cause. *See Forrest v. Trousdale Cty. Bd. of Educ.*, 954 F. Supp. 2d 720, 728 (M.D. Tenn. 2013). That said,

Plaintiff cannot reasonably argue that her position with AEP was eliminated to avoid dismissal for cause, when an entire program and over forty positions were eliminated. (ECF No. 46-1 at PageID 314.) And Plaintiff cites no law requiring Defendant to transfer her to an open position, for which she is qualified, rather than terminate her employment altogether. Under § 49-5-511(b), the only steps that must be taken in affording an excised teacher a new position is the administration of an evaluation and placement on the reemployment list. *See* Tenn. Code Ann. § 49-5-511(b)(1)–(4). But a teacher's inclusion on the reemployment list does not guarantee placement because "[a] principal may refuse to accept the placement or transfer of a teacher . . . [based on] [t]he teacher's most recent evaluations . . . ." Tenn. Code Ann. § 49-5-511(b)(3); *see also Lee v. Franklin Spec. Sch. Dist. Bd. of Educ.*, 237 S.W.3d 322, 334 (Tenn. Ct. App. 2007) (holding that the previous version of the statute did not "mandate that a board of education must re-employ [a] teacher" who was placed on the reemployment list). So the Court does not consider Defendant's failure to offer Plaintiff another position within the school system evidence of a sham reduction in force.

Finally, Plaintiff argues that because SCS violated the Tennessee Teacher Tenure Act in the way it terminated her under§ 49-5-511(b)(1), it also violated her due process rights under the Fourteenth Amendment. The Court disagrees.

That Defendant may have violated state law in the termination does not always violate due process. *See Kelley*, 198 F. Supp. 3d at 855. The Act gives the board of education the sole authority to dismiss teachers when it becomes necessary to reduce the number of teaching positions. *See* Tenn. Code Ann. § 49-5-511(b)(1). It may be true, as Plaintiff argues, that the superintendent and not the Board made the final determination to terminate Plaintiff's employment. (*See* ECF No. 46 at PageID 277.) Still such a delegation of

authority does not violate due process because an individual does not have an independent substantive right in a procedure designed to protect a substantive interest. *Olim v. Wakinekona*, 461 U.S. 238, 250–51 (1983) ("The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right."). For the same reasons, the alleged failure to determine Plaintiff's level of effectiveness before excising her position would not be a due process violation.

Plaintiff also argues that Defendant did not evaluate her performance or place her name on a reemployment list as required by the statute. (ECF No. 46 at PageID 278.) The Defendant's failure to evaluate her or place her name on the reemployment list may constitute a due process violation. *See Kelley*, 2018 WL 4628625, at *6 ("It is at least arguable that [Tenn. Code Ann. § 49-5-511(b)(3)] triggers a property interest."). That said, Plaintiff has proffered no evidence that Defendant failed to place her on the reemployment list. While Branch did testify at her deposition that she was unaware if Plaintiff was on the reemployment list, she also stated that her office did not handle placement on the list. (ECF No. 51 at PageID 937.) Plaintiff bears the burden of establishing that Defendant did not put her name on the list. She may not support this burden by espousing mere metaphysical doubts or subjective beliefs. Additionally, a mere scintilla of proof that would not support a jury finding in her favor does not establish a genuine issue. Branch's testimony would not establish by a preponderance of the evidence that Defendant failed to put Plaintiff on the reemployment list, because her testimony also establishes that her office does not handle placement on this list nor is she is familiar with the lists contents. (*See* ECF No. 51 at

PageID 937–38.)  Based on the evidence provided by Plaintiff, no reasonable jury could find that the SCS violated Plaintiff's due process rights.

There is therefore no genuine issue of fact as to Plaintiff's due process claim and Defendant is entitled to judgment as a matter of law on this claim.

## III.    Tennessee Public Protection Act Claim

Plaintiff also alleges that Defendant violated the Tennessee Public Protection Act ("TPPA") by terminating her employment in retaliation for reporting and refusing to participate in illegal activities.  (ECF No. 1 at PageID 2.)  The TPPA states that "no employee shall be discharged or terminated *solely* for refusing to participate in, or for refusing to remain silent about, illegal activities."  Tenn. Code Ann. § 50-1-304(b) (emphasis added).  To prevail on a claim under the TPPA, an employee must establish that: (1) "she reported the employer's illegal activity"; (2) the "reporting of the illegal activity furthered a clear public policy;" and (3) "her refusal to remain silent was the sole reason for the discharge."  *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 37 (Tenn. 2015) (citations omitted).  As stated by the Tennessee Supreme Court, the legislature chose to "set the bar high for recovery under a retaliatory discharge claim pursuant to the [TPPA]" by requiring the employee to prove that her refusal to remain silent was the sole reason for the discharge.  *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 28 (Tenn. 2011).  The TPPA addresses only termination, it does not concern other adverse employment actions.  *See* Tenn. Code Ann. § 50-1-304(b)(1).

Defendant argues that Plaintiff has failed to show that her reporting advanced a clear public policy or that her reporting was the sole reason for her termination.  (ECF No. 42-1 at PageID 137.)  Plaintiff responds that the TPPA protects her reporting even if it serves both a

18

personal and public interest. (ECF No. 46 at PageID 282.) And there is sufficient evidence that, under the cat's paw theory of analysis, the superintendent who approved her termination knew of her reporting. (*Id*.)

The Court need only address whether a reasonable jury could find that Defendant terminated Plaintiff solely because of her reports on the alleged illegal activities occurring at the AEP. The entire AEP program was eliminated because the state pulled the grant that funded the program. (ECF No. 46-1 at PageID 313.) As a result, all employees whose positions depended on grant funding were terminated. (*See id*.) Plaintiff's position was grant funded. (*See id*. at PageID 303.) Plaintiff disputes that her employment with the SCS had to be terminated altogether, as there were allegedly other open positions for which she was qualified. (*Id*. at 313–14.) At the same time she does not dispute that her position within the AEP had to be terminated. (*See id*.) And as stated above, Plaintiff cites no law requiring the SCS to transfer her to a new position, rather than terminate her employment altogether. As a result, a reasonable jury could not conclude that Plaintiff was terminated solely for reporting the illegal activity allegedly occurring at the AEP. Summary judgment in favor of Defendant on the TPPA claim is appropriate.

## IV.    Title VII Retaliation Claim

Plaintiff next alleges that Defendant retaliated against her for taking part in protected activities under Title VII of the Civil Rights Act of 1964. A plaintiff bears the burden to establish these elements of a prima facie case of retaliation under Title VII: "1) [she] engaged in activity that Title VII protects; 2) defendant knew that [she] engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action

exists." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (citing *Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001)). If the plaintiff meets this burden, the burden then shifts to the defendant "to articulate a legitimate, non-discriminatory reason for the adverse action." *Id.* (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000)).

If the defendant establishes a legitimate, nondiscriminatory reason for the action, the burden shifts back to the plaintiff to "demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action." *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "'Title VII retaliation claims must be proved according to traditional principles of but-for causation,' which 'require[ ] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Frazier v. Richland Pub. Health*, 685 F. App'x 443, 451 (6th Cir. 2017) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014)). "[T]he burden of establishing the prima facie case on summary judgment is 'easily met.'" *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 501 (6th Cir. 2013) (quoting *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004)). Also, "[a]n adverse employment action under Title VII's retaliation provision may be established by showing 'that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Frazier*, 685 F.3d at 450 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Plaintiff alleges that Defendant subjected her to the following adverse employment actions: (1) harassment over her EEOC complaint by her supervisors "immediately after" she started her new position at the AEP; (2) referrals to Labor Relations; (3) a written reprimand for her whistleblowing activity; (4) a negative job evaluation; and (5) termination. (ECF No. 46 at PageID 272–74.) Plaintiff also claims to have performed the following protected activities: (1) filing an EEOC claim in 2013 against SCS alleging age and race discrimination; (2) participating in a settlement agreement in August 2015 over the EEOC claim; (3) reporting retaliation to Labor Relations; and (4) filing another claim with the EEOC in December 2015 due to retaliation. (*Id.*)

### A. Plaintiff's Allegations of Harassment Support a Title VII Retaliation Claim.

Plaintiff claims that Miller harassed her on her first day of work in August 2015 and Griffin harassed her in September 2015. (ECF No. 46-1 at PageID 304–05.) Defendant first challenges Plaintiff's claim because: (1) Plaintiff has failed to establish that Miller and Griffin knew of the 2013 EEOC claim; and (2) Plaintiff has not established a causal connection between the protected activities and the adverse employment actions. Because Defendant does not address the other elements of a Title VII retaliation claim, the Court does not consider those elements.

### i. There is sufficient evidence that Griffin and Miller knew about the protected activity at the time of the harassment.

Plaintiff alleges that Griffin and Miller immediately harassed her after she assumed her role at the AEP. (ECF No. 1 at PageID 4; ECF No. 46 at PageID 272; ECF No. 46-1 at PageID 303.) The alleged harassment by Miller occurred in a single instance. (ECF No. 46-1 at PageID 303–04.) Miller allegedly told Plaintiff, in front of Griffin, that she "was glad the District [was] righting its wrong" and asked Plaintiff if she was being "compensated

fairly" for her position.  (*Id*. at PageID 304.)  Plaintiff alleges that this statement shows that Miller knew of the 2013 EEOC claim.  And Miller's depositions show that she learned of the filing near the date Plaintiff began her role at the AEP.  (ECF No. 63 at PageID 2142–2144.) What is more, Branch testified that Miller took part in the 2015 EEOC settlement negotiations.  (ECF No. 51 at PageID 936.)  Plaintiff also alleges that Griffin knew about the 2013 EEOC claim because she was present during Plaintiff's conversation with Miller.  (ECF No. 46 at PageID 285.)  She also argues that Griffin knew about the 2015 EEOC settlement agreement because Griffin wrote Plaintiff a letter stating that Griffin would not reveal the "circumstances by which you took the AE Advisor position."  (ECF No. 46-1 at PageID 304; ECF No. 42-5 at PageID 198.)  Viewing the evidence in the light most favorable to Plaintiff, it is reasonable to assume that Miller and Griffin knew of the Plaintiff's protected activities— her EEOC claim and settlement.

> ii.  **Plaintiff has established a causal connection between the harassment and her protected activity based upon temporal proximity.**

Plaintiff alleges that the temporal proximity between her participation in the 2015 settlement negotiations and her being harassed by Miller and Griffin establishes a causal connection.  (ECF No. 46 at PageID 286.)  Defendant argues that it is the date the 2013 EEOC claim was filed, and not the date of the 2015 settlement negotiations, that the Court should use in determining temporal proximity.  (ECF No. 70 at PageID 2351–52.)

First, "temporal proximity alone can establish causation."  *Amos v. McNairy Cty.*, 622 F. App'x 529, 537 (6th Cir. 2015) (citing *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014)) (holding that an employee's termination seventeen days after the EEOC performed an onsite investigation established a causal connection); *see also Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that a

temporal proximity of three months between filing an EEOC charge and employee being terminated established a causal connection). Second, "temporal proximity need not be measured from the EEOC charge alone. Rather, Title VII states that '[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Id*. at 538 (quoting 42 U.S.C. § 2000e-3(a)) (emphasis removed).

The parties have provided no cases for or against classifying participation in EEOC settlement agreements as a protected activity. The Court therefore finds for purposes of summary judgment that Plaintiff participated in a protected activity by engaging in EEOC settlement negotiations in August 2015. Thus, Plaintiff alleges that both instances of harassment took place within about one month of her participating in the EEOC settlement negotiations. Considering that the burden of establishing a prima facie case is "easily met," the temporal proximity between the harassment and the protected activity is enough to establish causation. Because Defendant has not disputed that the harassment constitutes an adverse employment action nor has it provided a legitimate, nondiscriminatory reason for the adverse employment action, the Court finds that a genuine issue of fact exists as to Plaintiff's claim for retaliation under Title VII for the alleged harassment she suffered from her supervisors.

**B.      Plaintiff Alleges a Prima Facie Case of Retaliation for the Referrals to Labor Relations.**

Plaintiff also claims that Defendant retaliated against her when it twice referred her to Labor Relations. Griffin sent Plaintiff to Labor Relations in October 2015, for insubordination and then again in early 2016, for unprofessionalism and insubordination.

(ECF No. 46-1 at PageID 309, 312–13.)  Plaintiff alleges that the October referral occurred "very close" in time to her reporting to SCS in September 2015 that she was being retaliated against for her 2013 EEOC claim.  (ECF No. 46 at PageID 287.)  She alleges that SCS knew about the retaliation report because Labor Relations received an email about it and the email is part of her disciplinary file.  (*Id*. at PageID 286.)  She also alleges that the January referral occurred "very close" in time to her filing her December 2015 EEOC claim.  (*Id*.)  Plaintiff alleges that SCS was aware of this claim because Branch testified that she handled the claim along with SCS's in-house counsel, Cecelia Barnes.  (ECF No. 46-2 at PageID 320.)

Title VII protects activities like reporting retaliation for filing an EEOC claim and filing EEOC claims.  *See* 42 U.S.C. § 2000e-3(a).  Plaintiff must next establish that a referral to Labor Relations is an adverse employment action.  The Supreme Court has stated that, when considering whether an employment action is materially adverse, it is "important to separate significant from trivial harms."  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  "[P]etty slights, minor annoyances, and simple lack of good manners" typically do not constitute adverse employment actions because they will normally not deter a reasonable employee from filing an EEOC claim.  *Id*.  In *Burlington*, the Supreme Court stated that "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination."  *Id*. at 69.  Being referred to Labor Relations for alleged misconduct is just as, if not more, materially adverse as exclusion from a training session.  The Court, therefore, finds that being referred to Labor Relations for alleged misconduct is a materially adverse employment action. *Compare Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (holding that placing

plaintiff on paid administrative leave and a ninety-day performance plan was a materially adverse employment action), *and Henry v. Abbott Labs.*, 651 F. App'x 494, 504–05 (6th Cir. 2016) (holding that the combination of a low performance evaluation, increased scrutiny, and a letter threatening more actions amounted to a materially adverse employment action), *with Siegner v. Twp. of Salem*, 654 F. App'x 223, 231 (6th Cir. 2016) (holding that a warning about the plaintiff's failure to meet department participation goals did not constitute a materially adverse employment action).

Viewing the factual allegations in the light most favorable to Plaintiff, the Court can assume that SCS was aware of Plaintiff's protected activities. Additionally, the temporal proximity between the protected activities and the adverse employment actions establish a causal connection. For that reason, Plaintiff has established a prima facie case of retaliation under Title VII for her referrals to Labor Relations. Defendant has not offered a legitimate, nondiscriminatory reason for the referrals to Labor Relations. The Court therefore finds summary judgment inappropriate on these claims.

### C. Plaintiff Alleges a Prima Facie Case of Retaliation for the Written Reprimand and Negative Job Evaluation.

Plaintiff next claims retaliation when she received a written reprimand in late 2015, and a negative job evaluation in early 2016. (ECF No. 46 at PageID 287.) Defendant argues that Plaintiff has not established knowledge or causation. (ECF No. 42-1 at PageID 140.) Defendant does not dispute that written reprimands and negative evaluations constitute adverse employment actions. As stated above, Plaintiff has established that SCS was aware of the December 2015 EEOC claim. The written reprimand occurred twenty days after she filed claim. The temporal proximity between the two events is close enough to establish a causal connection. Additionally, while two months passed between filing the claim and the

negative evaluation, the Sixth Circuit has found a causal connection based on a temporal proximity of three months. *See Singfield*, 389 F.3d at 563. Defendant has not articulated a legitimate, nondiscriminatory reason for these adverse employment actions. Thus, the Court holds that Plaintiff has established sufficient evidence of a causal connection to establish a prima facie case of retaliation over the written reprimand and negative evaluation.

**D. Plaintiff Failed to Prove That Defendant's Reason for Her Termination Is Pretext.**

Plaintiff also claims to have been terminated from her employment with SCS in retaliation for her filing her 2015 EEOC claim. (ECF No. 46 at PageID 287–88.) Defendant argues: (1) that Plaintiff has failed to establish a prima facie claim of retaliation for her termination because Hopson, who ultimately signed off on her termination, was unaware that Plaintiff had engaged in protected activity; (2) that Plaintiff has failed to establish a causal connection; and (3) that there is a legitimate, nondiscriminatory reason for her termination. (ECF No. 42-1 at PageID 140–41.) In essence Defendant states that because Defendant terminated Plaintiff's employment along with over forty other employees after the AEP lost its funding, there is a nondiscriminatory reason for her termination. (*Id*. at PageID 141.)

Plaintiff argues that she can show knowledge by applying the cat's paw theory of analysis, because Hopson relied on the Labor Relations Department to handle the reduction in force. (ECF No. 46-2 at PageID 317.) And Plaintiff asserts that Defendant's reduction in force explanation is unreasonable—showing that it could not have motivated the decision—because Defendant did not evaluate her level of effectiveness before her termination nor was she considered for other placement. (ECF No. 46 at PageID 289–90.)

The Court finds that Plaintiff has established a prima facie case of retaliation because of Branch's knowledge of Plaintiff's protected activities and the temporal proximity between

those activities and her termination.  Even so, Defendant has offered a legitimate,

nondiscriminatory reason for Plaintiff's termination and Plaintiff has failed to rebut this

showing.

     **i.**       **Defendant articulated a legitimate, nondiscriminatory reason for Plaintiff's termination.**

Plaintiff's termination was prompted by the loss of grant funding, which caused the

entire AEP program to be closed and the SCS to terminate employees whose salaries

depended on grant funding.  (ECF No. 46-1 at PageID 313.)  Over forty employees,

including at least five full-time employees, were terminated from their positions.  (*Id*. at 314.)

Plaintiff was among these employees whose salaries depended on grant funding.  (*Id*. at 303.)

The Court finds that a reduction in force of more than forty employees for lost funding

constitutes a legitimate reason for Plaintiff's termination.  *See Chavez v. URS Fed. Tech.*

*Servs., Inc.,* 504 F. App'x 819, 821 (11th Cir. 2013) (finding that a reduction in force because

of budget cuts was a legitimate, nondiscriminatory reason for an employee's termination).

The burden therefore shifts back to Plaintiff to rebut Defendant's reason.

     **ii.**      **Defendant's reasoning is not pretext.**

Plaintiff must "demonstrate by a preponderance of the evidence that the proffered

reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has

no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to

motivate the adverse action." *Abbott*, 348 F.3d at 542.  A plaintiff can show that a proffered

reason is baseless by establishing that it did not occur.  *Id*. at 544.  As for the second category

for establishing pretext, a plaintiff admits that the proffered reason for the adverse action

"could motivate dismissal," but that "the sheer weight of the circumstantial evidence of

discrimination makes it 'more likely than not' that the employer's explanation is a pretext or

coverup." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167 (2009). To establish the third category of pretext, the Plaintiff must show that the employer did not terminate other employees who engaged in similar conduct. *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (citing *Manzer*, 29 F.3d at 1084). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Alberty v. Columbus Twp.*, 730 F. App'x 352, 361 (6th Cir. 2018) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)) (alteration in original).

Plaintiff does not dispute that the state pulled the grant funding for AEP and that SCS had to close the AEP program. (*See* ECF No. 46-1 at PageID 313–14.) This closing required employee layoffs. (*See id.*) While Plaintiff disputes whether the SCS had to terminate Plaintiff's employment, she does not dispute that layoffs occurred because of the loss of grant funding. As a result, the first category of rebuttal does not apply. And Plaintiff does not allege that SCS retained other AEP employees who were engaged in similar conduct. That is why the third category of rebuttal does not apply.

Thus, Plaintiff is left arguing under the second rebuttal category that she was "more likely than not" fired for her engagement in protected activities rather than financial restraints. She alleges that because SCS did not follow state law in terminating her or consider her for any of over 100 positions that she has applied for, "SCS's articulated reason is false and could not have motivated its decision." (ECF No. 46 at PageID 289–90.) Plaintiff states that "SCS subjected [her] to unfounded write-ups, built up a disciplinary file,

and then ultimately fired her." (*Id*. at PageID 288.)  Plaintiff therefore argues that retaliatory animus was the motivating factor behind her termination—not the loss of grant funding. For all that, Plaintiff must link this alleged illegal motive to Hopson, who ultimately made the decision to terminate her.  (*See* ECF No. 46 at PageID 290.)  Plaintiff seeks to apply this link by asserting a cat's paw theory of liability.

### iii.    Plaintiff does not establish liability under a cat's paw theory.

Plaintiff asserts that although Hopson made the final decision to terminate her, Hopson relied on Branch and the Labor Relations Department to determine which employees to lay off from the AEP.  (ECF 46-2 at PageID 317.)  Essentially, Plaintiff alleges that it was Branch who harbored the retaliatory animus and that animus was imputed to Hopson.

The Sixth Circuit has adopted the cat's paw theory of liability in Title VII retaliation cases.  *See Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427 (6th Cir. 2014). "The Supreme Court . . .  defined this so-called 'cat's paw liability' as follows: 'if a [non-decisionmaker] performs an act motivated by [discriminatory] animus that is *intended* by the [non-decisionmaker] to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable."  *Id*. (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)).  Thus, Plaintiff must establish a causal nexus between Hopson's decision to terminate her and Branch's alleged retaliatory motive.  *See Chattman*, 686 F.3d at 350.

An adequate causal nexus exists if Plaintiff shows: (1) non-decisionmakers acted with intent to result in Plaintiff's termination in retaliation for her protected conduct; and (2) those retaliatory actions were the but-for cause of Plaintiff's termination.  *See Seoane-Vazquez*, 577 F. App'x at 428.  Under this standard, the retaliatory actions must be more than a motivating

factor. *Id.* Liability cannot be established where Plaintiff's termination was "prompted by both legitimate and illegitimate factors." *Id.* (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 383 (2013) (Ginsburg, J., dissenting)). "So long as the untainted factors were sufficient to justify [Hopson's] ultimate decision, the [Defendant] will be entitled to summary judgment." *Id.* at 428–29.

Plaintiff has proffered no evidence that Branch retaliated against her or harbored any animus towards her. She merely alleges that Branch knew about Plaintiff's protected activities (*see* ECF No. 46-2 at PageID 319) and participated in Plaintiff's disciplinary sessions. (*See* ECF No. 46-1 at PageID 310.) Plaintiff has perhaps shown that her disciplinary record could have been a motivating factor of her termination, yet she has failed to show that the desire to retaliate against Plaintiff was the but-for cause of the adverse employment decision. It is undeniable that Plaintiff's termination was prompted by a cut in funding. With that in mind, "[i]f the retaliatory actions of non-decisionmakers were nothing more than a motivating factor of [Hopson's] decision, then retaliation could not have been a but-for cause of the ultimate employment action." *Seoane-Vazquez*, 577 F. App'x at 428. On that basis, the Court finds that Hopson's decision to end Plaintiff's employment was not caused by the retaliatory actions of non-decisionmakers. *See id.* at 431. Plaintiff has failed to show evidence that would allow a reasonable juror to find that illegal retaliation was the but-for cause of her termination. The Court thus grants summary judgment for Defendant on this claim.

## V.    Tennessee Teacher Tenure Act, Tenn. Code Ann. § 49-5-511(b)

Lastly, Defendant argues that Plaintiff is not entitled to relief under the Teacher Tenure Act (the "Act"), Tennessee Code Annotated § 49-5-511(b).[4]  (ECF No. 42-1 at PageID 141.)    Defendant states that the statute does not apply to Plaintiff because she was an advisor and not a teacher; Plaintiff has not provided evidence that it violated the statute; and that the statute does not provide a remedy for its violation.  (ECF No. 70 at PageID 2346–49.)

First, the term "teacher" is defined under the Act as including supervisors and all other certificated personnel employed by a local board of education.  Tenn. Code Ann. § 49-5-501(10).  Plaintiff's advisor position required certification in administration and supervision, and a current Tennessee teaching license.  (ECF No. 42-5 at PageID 204.)  As a licensed teacher and certificated advisor, the statute covers Plaintiff.  Second, Plaintiff has established a genuine dispute over whether Defendant followed the requirements of the statute.  For example, she alleges that it was Superintendent Hopson and not the Shelby County Board of Education that terminated her employment.   (ECF No. 70-1 at PageID 2358–59; ECF No. 59-3 at PageID 1712.)  These allegations are supported by evidence showing that the Board did not include Plaintiff on a list of SCS employees affected by the 2015-2016 reductions in force.  (*See* ECF Nos. 59-3, 61–62.)  Besides, it is Hopson, and not the Board, who sent Plaintiff her termination letter.  (ECF No. 60 at PageID 1780.)  A reasonable juror may rely on this evidence in finding in Plaintiff's favor.

---

[4] The Court notes that although the parties refer to the whole Act, the specific dispute is over the dismissal statute in § 49-5-511(b).

Finally, the Court should address whether the Act provides a remedy for violating § 49-5-511(b).  The current remedy for a violation of § 49-5-511(b) is reinstatement and back pay.  *See Kelley v. Shelby Cty. Bd. of Educ.*, 198 F. Supp. 3d 842, 855 (W.D. Tenn. 2016) (finding that the remedy for a violation of Tenn. Code Ann. § 49-5-511(b) is the same as § 49-5-511(a)(3)); *Lee v. Franklin Cty. Spec. Sch. Dist. Bd. of Educ.*, 237 S.W.3d 322, 337 (Tenn. Ct. App. 2007) (same); *Randall v. Hankins*, 675 S.W.2d 712, 714 (Tenn. Ct. App. 1984) (same).  Defendant calls this remedy into question given the holding in *Emory v. Memphis City Schools Board of Education*, 514 S.W.3d 129 (Tenn. 2017).

In *Emory*, the Tennessee Supreme Court held that there was no remedy for failing to provide a tenured teacher who had been terminated for cause a hearing within thirty days under § 49-5-512(a)(2), because the statute provided "no specific penalty for noncompliance" and "[c]ourts are not at liberty to rewrite statutes."  514 S.W.3d at 145.  This particular section of the statute provided a hearing for tenured teachers who were fired for cause.  *See* Tenn. Code Ann. § 49-5-512(a)(2).  The difference between *Emory* and this case is that *Emory* dealt with post-termination procedural requirements, *see Emory*, 514 S.W.3d at 144, while this case deals with the requirements that the school board must follow to terminate a teacher in the first instance.  *Compare* Tenn. Code Ann. § 49-5-512(a)(2), *with* Tenn. Code Ann. § 49-5-511(b)(1).  The violation in *Emory* did not invalidate the termination, while the violations alleged by Plaintiff would make her termination invalid.

The Court should read *Emory* along with *Thompson v. Memphis City Schools Board of Education*, which held that when "a tenured teacher's employment is summarily terminated in violation of the Tenure Act, section 49-5-511(a)(3) provides the appropriate remedy."  395 S.W.3d 616, 628 (Tenn. 2012).  Because *Emory* did not abrogate *Thompson*, the Court finds

that the remedy for a violation of the Act that invalidates a teacher's termination is backpay and reinstatement. *See Kelley*, *198 F. Supp. 3d at 855–56*; *Thompson*, *395 S.W.3d at 628*; *Lee*, 237 S.W.3d at 337. Because a genuine issue still exists over whether Defendant violated the statute, summary judgment is inappropriate.

## CONCLUSION

For these reasons, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment. The Court GRANTS summary judgment for Defendant and DISMISSES these claims:

1. 42 U.S.C. § 1983 First Amendment Retaliation;

2. 42 U.S.C. § 1983 Fourteenth Amendment Due Process;

3. Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304;

4. Title VII of the Civil Rights Act of 1964 for Retaliatory Termination, 42 U.S.C. § 2000e–3(a).

The Court DENIES the Motion on Plaintiff's Teacher Tenure Act claim and her Title VII retaliation claims related to harassment, referrals to Labor Relations, the written reprimand, and the negative job evaluation.

**SO ORDERED**, this 18th day of December, 2018.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE