**In the Matter Of:**

**DR. SONYA P. WILLIAMS vs**

**SHELBY COUNTY BOARD OF EDUCATION**

---

EDDIE JONES 30(B)(6) DEPOSITION

February 01, 2019

---



**EXHIBIT**

**D**

22 North Second Street/Suite 303, Memphis, TN, 38103 (901) 527-1100

```
        IN THE UNITED STATES DISTRICT COURT OF TENNESSEE
     FOR THE WESTERN DISTRICT OF TENNESSEE-WESTERN DIVISION
    -------------------------------------------------------
    DR. SONYA P. WILLIAMS,              *
                                        *
         Plaintiffs,                    *
                                        *
    VS.                                 *            No.
                                        * 2:17-cv-02050-SHM-
    SHELBY COUNTY BOARD OF EDUCATION,   *         egb
                                        *
         Defendants.                    *
    -------------------------------------------------------
```

30(b)(6) DEPOSITION OF EDDIE JONES

February 1, 2019

```
    -------------------------------------------------------
        AMY THOMAS EPSTEIN, RPR, LCR/CCR(TN), CSR(MS)
                    Riverside Reporting Service
                         434 Jason Drive
                  Memphis, Tennessee   38120
                       (901) 767-4025
```

1              The Deposition of EDDIE JONES taken

2     February 1, 2019, beginning at approximately 12:40

3     o'clock p.m., in the offices of Shelby County School

4     Board, 160 South Hollywood, Memphis, Tennessee,

5     pursuant to Notice to the parties, for any and all

6     purposes allowed under the Federal Rules of Civil

7     Procedure on behalf of the Plaintiff in the

8     above-styled cause.

9              All forms and formalities, including the

10    signature of the witness, are waived.    Objections,

11    except as to the form of the question, are reserved,

12    to be presented and disposed of at or before the

13    hearing.    Objections as to the form of the question

14    must be made at the taking of the deposition.

15

16

17

18

19

20

21

22

23

24



```
 1                   A P P E A R A N C E S

 2

 3     For the Plaintiff:

 4                  MS. TERESA A. LUNA
                    LEWIS L. COBB, ESQ.
 5                  Spragins, Barnett & Cobb
                    P.O. Box 2004
 6                  Jackson  Tennessee 38302-2204

 7

 8

 9     For the Defendant:

10                  GABRIEL P. McGAHA, ESQ.
                    Fisher & Phillips
11                  Suite 312
                    1715 Aaron Brenner Drive
12                  Memphis Tennessee 38120

13

14

15     Also Present: KERI WILLIAMS

16

17

18

19

20

21

22

23

24
```



1                    I N D E X                        PAGE

2    DIRECT EXAMINATION  BY MS. LUNA.................  5

3    CROSS EXAMINATION BY MR. McGAHA.................. 67

4    REDIRECT EXAMINATION BY MS. LUNA................ 90

5    RECROSS EXAMINATION BY MR. McGAHA:  ............. 96

6

7

8

9

10                   E X H I B I T S

11   NO.   DESCRIPTION                              PAGE

12   1   30(b)(6) notice............................  7

13   2   list of jobs Sonya Williams produced that
         she applied for ........................... 22
14
     3   list of jobs SCS produced that shows jobs
15       that Sonya Williams applied for ........... 31

16   4   2016 resolution with lists attached......... 34

17   5   Certified Position Abolishment Policy........ 41

18   6   Jones personal list of employees ........... 54

19

20

21

22

23

24



1                          EDDIE JONES

2     after having been duly sworn, was deposed and testified

3     as follows:

4                          DIRECT EXAMINATION

5     BY MS. LUNA:

6     Q.            Mr. Jones, we met just a moment ago.  My

7     name is Teresa Luna, and I represent Dr. Sonya

8     Williams in her case against the Shelby County School

9     System; and this is my partner, Lewis Cobb.  My

10    assistant, Keri Williams, will be entering in just a

11    moment; and you'll know her when she enters, so let

12    this be our formal introduction of you to her.

13                 I'm going to tell you that I understand

14    that you're here today in response to a 30(b)(6)

15    notice that I issued to the Shelby County School

16    System for a corporate representative of Shelby County

17    Schools to answer questions on behalf of the School

18    System.

19                 Is that your understanding as well?

20    A.            Yes.

21    Q.            Okay.  And I took the deposition of

22    Chantay Branch yesterday, and she was able to answer

23    some of the questions; and she told me that you would

24    be here today answering others of those questions.



1          So may I assume that if you answer the

2   question that you are the person that the Shelby

3   County School System has put in place to answer that

4   particular question?

5   A.          I would assume.  I'm assuming.  I was not

6   told that there were questions that are -- that only I

7   can answer.  I was just told to show up.

8   Q.          Okay.  Well, if you -- if you're not the

9   person designated to answer the question, if you'll

10  just let me know I'm not the person?

11  A.          Yes, ma'am.

12  Q.          And then otherwise I'll assume that you

13  are the person.

14  A.          Great deal.  Yes, ma'am.

15  Q.          I want to show you an exhibit from

16  Ms. Branch's deposition yesterday.  This is Exhibit 1

17  to her deposition, and this is the 30(b)(6) notice

18  that was issued by the -- by us to the School System.

19          Have you seen that before?

20  A.          I have not, no.

21  Q.          Okay.  Well, let me ask a question -- let

22  me go ahead and make that Exhibit 1, Exhibit 1 to

23  Ms. Branch's deposition we're going to also make

24  Exhibit 1 to your deposition.



```
 1                    (Whereupon, Exhibit 1 was

 2                 marked as an exhibit to the deposition of

 3                 the witness and can be found among the

 4                 deposition exhibits attached hereto.)

 5     BY MS. LUNA:

 6     Q.           Because that's the notice that you are

 7     here in response to.

 8     A.           Okay.

 9     Q.           Let me ask you this.  The -- how did you

10     prepare for this deposition today?

11                       MR. McGAHA:  Object to form.

12     BY MS. LUNA:

13     Q.           You may answer.

14                       MR. McGAHA:  You can answer.

15                 Well, you can answer generally.

16                       THE WITNESS:  Okay.  So in

17                 general -- now, I -- I'm looking through

18                 this, and I'm wondering was this sent to

19                 me via e-mail.  I don't know.  It may

20                 have -- I -- I've not read through all of

21                 this to know that this is something that

22                 was sent to me.

23     BY MS. LUNA:

24     Q.           Okay.
```



 1   A.              But in preparation for today part of what

 2   I did was to just pretty much familiarize myself with

 3   her as an applicant.  I went into iCIMS just to kind

 4   of familiarize myself with whether or not she had

 5   applied for any positions.

 6               I also talked with counsel here as well

 7   as Chantay about pretty much --

 8                    MR. McGAHA:  (Interposing.)

 9               Uh-uh-uh, that's privileged.  Don't

10               answer that.

11   BY MS. LUNA:

12   Q.              Let me clear this up.  I don't want to

13   know anything that you and your counsel discussed.

14   A.              Yes, ma'am.

15   Q.              Okay.  But anything that you discussed

16   with anyone else, I'm going to ask you about that in

17   just a moment.

18   A.              Okay.

19   Q.              Right now I'm just asking -- let me ask

20   it this way.  What documents did you review to

21   prepare?

22   A.              Just the iCIMS.

23   Q.              What is that?

24   A.              iCIMS is our platform that we use for



DR. SONYA P. WILLIAMS vs SHELBY COUNTY BOARD OF EDUCATION                          30(b)(6)
30(B)(6) DEPOSITION,  EDDIE JONES on 02/01/2019                                         9

1    applications.

2    Q.           I-S?

3    A.           I-C-I-M-S.

4    Q.           Applications that --

5                          MR. McGAHA:  (Interposing.)

6                I'm going to stop the witness right

7                there.  So he reviewed iCIMS

8                independently, and I want to make it

9                clear to the witness that you do not need

10               to answer a question related to documents

11               that you reviewed or discussions that

12               were had with counsel.

13                         THE WITNESS:  Okay.

14   BY MS. LUNA:

15   Q.           I thought I made that clear.  Anything

16   that you -- that was written with Mr. McGaha --

17   A.           (Interposing.)  Sure.

18   Q.           (Continuing.)--  or spoken to him, I'm

19   not asking about that.

20   A.           Okay.

21   Q.           I'm asking for Shelby County Schools

22   documents that you reviewed.

23                         MR. McGAHA:  Independently.

24   BY MS. LUNA:



1    Q.              Well, any documents that you reviewed.

2                         MR. McGAHA:  No, any documents

3                    that you reviewed independently, not with

4                    me.

5                         THE WITNESS:  Yes.

6                         MR. McGAHA:  Is that clear?

7                         MS. LUNA:  No, it's not clear.

8                         MR. McGAHA:  Do you have any

9                    objection to that?

10                        MS. LUNA:  Well, this is my

11                   deposition, and I'm not the one that's

12                   supposed to object.

13                        MR. McGAHA:  Well, I mean, let

14                   me ask you this.

15                        MS. LUNA:  I have the right to

16                   know all the documents that he reviewed.

17                        MR. McGAHA:  The documents that

18                   he reviewed with me reveals work product.

19                        MS. LUNA:  So are you

20                   instructing him not to --

21                        MR. McGAHA:  (Interposing.)

22                   Yes.

23                        MS. LUNA:  Okay.

24                        MR. McGAHA:  I'm instructing --



1   let me be clear what I'm instructing on

2   the record.  I'm instructing the witness

3   not to answer any questions related to

4   our discussions or his discussions with

5   any other counsel for SCS.

6            I am also instructing the

7   witness not to answer any questions with

8   respect to what documents he reviewed at

9   the direction of or in the presence of

10  counsel for SCS.

11           MR. COBB:  Let me make this

12  observation.  I understand that if you

13  have -- or, your firm prepared documents

14  and he's looked at your documents that

15  you've prepared for litigation, that's

16  one category; but if he's looked at

17  public documents and therefore he knows

18  what's in public documents, that

19  knowledge base is his independent of what

20  you've done.

21           MR. McGAHA:  But...

22           MR. COBB:  And whether he

23  looked at them with you by his side or

24  not still is information he's learned



1    from public records.

2              MR. McGAHA:  But what he has

3    reviewed at my direction reveals work

4    product, because it reveals a litigation

5    strategy, wouldn't it?

6              MS. LUNA:  Let's be clear.

7    Let's be clear of what you're instructing

8    him not to answer on.

9              MR. McGAHA:  I've been clear.

10             MS. LUNA:  Let's divide it in

11   two categories, and let me ask you these

12   questions.  Number one, you're

13   instructing -- are you instructing him

14   not to tell me what documents he reviewed

15   even though they're public documents if

16   he reviewed them in your presence?

17             MR. McGAHA:  Yes, if he

18   reviewed those documents in my presence

19   in preparation for this deposition.  If

20   he reviewed those documents independently

21   and in my presence, he can reveal that;

22   but if he only reviewed a document with

23   me in my presence in preparation for this

24   deposition, he is instructed not to



1    answer the question.

2              MS. LUNA:  Even though they're

3    public record?

4              MR. McGAHA:  Even though

5    they're public -- any documents.

6              MS. LUNA:  Thank you; and we'll

7    just bring this up with -- there is no

8    point in delaying today.  We'll bring it

9    up with the judge later.

10             MR. COBB:  Let me ask one more

11   thing to clarify.  Let's assume the

12   extreme example, which is the only time

13   he reviewed documents was with you.

14             MR. McGAHA:  Uh-huh

15   (affirmative).

16             MR. COBB:  Then he wouldn't be

17   able to talk about any documents.

18             MR. McGAHA:  No, I didn't say

19   he couldn't talk about the documents.  I

20   said he can't tell you what he reviewed

21   with me.  You can ask him questions, and

22   he can answer those questions based on

23   what he knows; but you're asking --

24             MR. COBB:  (Interposing.)  And



1    we say, how do you know that.  He says,

2    well, that was document number 101,

3    whatever.  It's problematic, and I'm

4    trying to figure out a way to go forward

5    and not get hung up on --

6          MR. McGAHA:  (Interposing.)  I

7    think this is something that we're being

8    hung up on for no reason.  We don't have

9    a lot of time.

10          MS. LUNA:  I think that -- I

11    mean, Gabe and I have had a long history

12    of this in depositions, and we don't ever

13    tend to come to any kind of resolution of

14    them.  So I think I'll just bring it up

15    with the judge.

16          MR. McGAHA:  Do what you need

17    to do.

18          MS. LUNA:  And I'm going to

19    reserve the right to depose the witness

20    again if indeed the judge does allow us

21    to ask that particular question.

22          MR. McGAHA:  Okay.

23          MR. COBB:  One last thing.  We

24    don't want to keep coming here and having



```
 1                 you raise the same objection to the same

 2                 category of documents.  So we're going to

 3                 assume any time we ask him about

 4                 something he reviewed with you, you'd

 5                 make the same objection and we would

 6                 arrive at the same point, take it up with

 7                 the judge.  Fair enough?

 8                       MR. McGAHA:  Sure.

 9     BY MS. LUNA:

10     Q.          Let me ask you another question, and

11     maybe this one won't incite an objection.  In getting

12     ready for today what other Shelby County School System

13     employee or Board member did you speak with in getting

14     ready for the deposition today?

15                       MR. McGAHA:  Object to form.  I

16                 need to make a speaking objection,

17                 because who he prepared with in my

18                 presence is also privileged.  Who he

19                 spoke with outside of the presence of SCS

20                 counsel is not.

21     BY MS. LUNA:

22     Q.          I'm asking you who you spoke with outside

23     of the presence of Mr. McGaha.

24     A.          No one.
```



1    Q.          No one?

2    A.          (Witness shakes head negatively.)

3    Q.          You didn't go to any other department and

4    say, hey, I need to ask you about this with regard

5    to --

6    A.          (Interposing.)  No, ma'am.

7    Q.          Okay.

8    A.          No.

9    Q.          Mr. Jones, what preparation did you do

10   for this deposition other than with Mr. McGaha?

11   A.          Nothing.  That's it.  As I stated to you

12   before, I just -- I went online just in iCIMS; and I

13   apologize.  When you say documents, that's what I

14   think of.

15   Q.          Okay.

16   A.          Is any paper; and I'm now sensing that

17   you're talking about formal documents.  So I -- that's

18   all I did, was just to make sure certain I knew who

19   this person was, if they were truly an applicant; and

20   that's all I did.

21   Q.          And by documents I mean electronic

22   documents as well.

23   A.          Uh-huh (affirmative).

24   Q.          Not just paper documents.  So anything



1   that you reviewed on a computer, I'm asking that as

2   part of my question as well.

3   A.          Nothing else other than iCIMS, yes,

4   ma'am.

5   Q.          And iCIMS is -- you're saying that's the

6   application platform?

7   A.          Yes.  It's the application tracker.

8   Q.          Okay.

9   A.          So anyone who applies for a position, who

10  has applied for a position since 200-- mid 2016, if

11  they've applied, that's applied through iCIMS.  If

12  they applied prior to then, they applied through

13  SearchSoft.

14  Q.          Is that something that's available to

15  someone outside of the Shelby County School System to

16  look into?

17  A.          It's available for you to apply, but not

18  available for you to review data.  That data is housed

19  with those that work in HR.

20  Q.          If you are an applicant --

21  A.          (Interposing.) Uh-huh (affirmative).

22  Q.          (Continuing.)-- and you've applied for

23  several positions --

24  A.          (Interposing.)  Yes, ma'am.



1   Q.          (Continuing.)-- even though you're not

2   within the School System now, may you go into that

3   system?

4   A.          As long as you have a user name and

5   password that you would have generated.

6   Q.          Okay.  I want to show you a document that

7   Dr. Williams has presented to the Court -- that

8   Dr. Williams has presented to the Court, and it was

9   attached to an affidavit where she says these are the

10  jobs that I have applied for within the Shelby County

11  School System.

12              And the first few pages are in a

13  different format than the lists that are on the last

14  few pages of that packet of papers.

15  A.          I apologize.  I'm trying to --

16  Q.          (Interposing.)  Okay.

17  A.          Without having to use another hand.

18              Yes, ma'am.

19  Q.          Let me ask you a couple of questions

20  about this packet of documents.  The first few

21  pages --

22  A.          (Interposing.) Uh-huh (affirmative).

23  Q.          (Continuing.)-- what format were those

24  pulled from the Shelby County School System?



1    A.              That's probably from the actual page when

2    you -- it could be, like, if you -- if you go on and

3    you see a job and it has a job description and it has

4    all the layout of that particular job individually,

5    you can print that individual page out so that when

6    you get ready to interview, you can kind of refresh

7    your mind about the job requirements.

8              The other pages obviously would be just

9    one page of all of the different positions that either

10   are posted or that you have applied for.

11   Q.              Okay.  And this -- this is pulled from

12   the Shelby County Schools' website.

13   A.              Now, this might have been from the

14   website -- no, this looks like it was in iCIMS.

15   Q.              Okay.

16   A.              Or they got e-mail and maybe it -- I'm

17   not certain, because I've not applied for jobs per se

18   as an applicant.  I probably should have pretended

19   like I was an applicant so I'd know exactly how they

20   see things.  I see it from a different perspective,

21   though.  So I'm assuming just because it says Applied

22   Job at the top that that's what this is.

23   Q.              Okay.  But you don't have any question

24   that this came from your --



1    A.              (Interposing.)  Oh, no.

2    Q.              (Continuing.)-- system?

3    A.              No, no.  It looks like it's -- these are

4    definitely positions.  I saw some part-time tutor

5    positions in here, and I do know from -- and virtual

6    school instruction.  That's not uncommon.  Those are

7    definitely --

8                    And then in the coding on the back with

9    regard to the C11, that would -- you know, all these

10   have a special code.  So, like, it would be spring of

11   or -- I think CN -- I forgot the initials now, but I

12   think that's what they're using.  That's -- are they

13   using that now?

14                   I'd have to look on there and compare it.

15   I'm not certain if they're using this, because I'm

16   used to dealing with PCNs.  PCNs don't look like the

17   codings on the side here.

18   Q.              Okay.

19   A.              That's more or less internal.

20   Q.              My understanding --

21   A.              (Interposing.)  Sure.

22   Q.              (Continuing.)-- which could be wrong --

23   but my understanding is that these items, like here on

24   the first page it says withdraw interest for this job,



1    is a button that you can click --

2    A.            (Interposing.)  Uh-huh (affirmative).

3    Q.            (Continuing.)-- if you were online, and

4    this was printed from that page online.

5    A.            Uh-huh (affirmative).

6    Q.            And that over here (indicating) these

7    dark -- on, for example, the last page and several of

8    the last pages it says View there?

9    A.            Uh-huh (affirmative).

10   Q.            That's a part of that page that the

11   applicant is looking at where if they want to click on

12   a particular job and look at it that your system gives

13   them --

14   A.            (Interposing.)  Sure.

15   Q.            (Continuing.)-- the ability to do that.

16   A.            To go back to that initial page, which

17   would be the job description and all that.

18   Q.            Is that your understanding as well?

19   A.            Uh-huh (affirmative).

20   Q.            Is that yes?

21   A.            Yes.

22                       MS. LUNA:  Okay.  Let me make

23                 this Exhibit 2.

24                       (Whereupon, Exhibit 2 was



1                    marked as an exhibit to the deposition of

2                    the witness and can be found among the

3                    deposition exhibits attached hereto.)

4        BY MS. LUNA:

5        Q.          I got offtrack, because I wanted to --

6        you mentioned something about the job applications,

7        and I wanted to go ahead and get that in; but let me

8        ask you a little bit about you.

9        A.          Okay.

10       Q.          I know that your name is Dr. Eddie Jones?

11       A.          Uh-huh (affirmative).

12       Q.          What position do you hold here at the

13       School System?

14       A.          I am the manager of Recruitment and

15       Staffing.

16       Q.          How long have you been in that position?

17       A.          Oh, God.  Officially?  2018 -- Nancy

18       stayed for an entire year 2017.  I would say -- God,

19       how long -- I can look it up officially in Apex right

20       now, but...

21       Q.          Just give me an estimate.

22       A.          A year and a half.

23       Q.          Okay.

24       A.          Yes.



1   Q.                How long have you been with the School

2   System in total?

3   A.                Twenty -- this is my -- going into my

4   twenty-fifth year.

5   Q.                Let's start back at your year one.  What

6   was your first job with the School System?

7   A.                First job was a teacher teaching -- well,

8   actually I was doing a year long internship at Kirby

9   High School teaching British Literature to twelfth

10  graders; and I got hired on the following year at

11  Kirby Middle School teaching seventh grade grammar,

12  and that was my early start.

13  Q.                How long were you a teacher within the

14  School System?

15  A.                Three and a half years.

16  Q.                Was it Memphis City or Shelby County?

17  A.                It was Shelby County Schools at the time.

18  Q.                Okay.  By the way, I'm a certified

19  English and history teacher too.  I'm a retired

20  teacher.

21  A.                Awesome.

22  Q.                After being a teacher for three and a

23  half years, what did you do within the School System?

24  A.                I was promoted to an experimental program



1    that we had for Alternative Schools.  It was at night

2    where kids who had been suspended would come to my

3    school at 4:00 o'clock in the afternoon and stay until

4    8:00 and receive instruction so that they would not

5    lose credits; and then at that point -- I did that for

6    a year and a half, and the District, the area I was

7    in, Kirby, was rezoned.  It was taken over citywide,

8    and so they had to go into the City School System.

9              And at that time I left to take on

10   assistant principal position at Collierville -- in

11   Collierville at Schilling Farms Middle School where I

12   was the assistant principal from the building of the

13   school, and then I left there and went and became the

14   principal of a new school being built in Cordova,

15   Dexter Middle School.

16   Q.        How long were you at Schilling Farms?

17   A.        Two, three -- two and a half -- no, two

18   years, two years solid, yes.

19   Q.        How long were you at Dexter Middle?

20   A.        Oh, one, two -- two years, uh-huh

21   (affirmative).

22   Q.        I'm trying to add up the years now.

23   A.        Yes, that's fine.

24   Q.        But I think there were still some things



1    that you did between being the -- were you principal

2    at Dexter Middle?

3    A.          I was principal at Dexter Middle.

4    Q.          After principal at Dexter Middle what did

5    you do?

6    A.          Actually Schilling Farms was three years.

7    Q.          Okay.

8    A.          And then Dexter Middle was two years; and

9    the Superintendent asked if I would be willing to come

10   and be the minority recruiter for the District, and so

11   I did.

12   Q.          Sill for Shelby County?

13   A.          Still for Shelby County Schools.

14   Q.          How long were you the minority recruiter?

15   A.          Up until the merger, and the merger

16   happened in 2013.  So that would be -- oh, God.  When

17   did I come down to the Board?   You're making me date

18   myself.  I'm going to estimate fifteen years at least

19   I was down there.

20   Q.          As minority recruiter?

21   A.          As a minority recruiter.

22   Q.          Okay.  Was there any job that you held

23   between being minority recruiter and being the manager

24   of Recruitment and Staffing?



1    A.            Yes.

2    Q.            Okay.

3    A.            So at the merger I came aboard as an

4    advisor, HR advisor.  I served in that capacity for a

5    year; and they first started the department, asked if

6    I would come back as a business partner.  So I served

7    as a business partner for two years.

8    Q.            And I've heard that term before.  What is

9    a business partner?

10   A.            Business partner is a corporate model

11   that's used a lot in corporations where they are a

12   strategist.  They strategically work with hiring

13   managers to insure that they get the right applicant

14   and that things get pushed through.  They're not a

15   paper pusher, but they are kind of a forethought, say,

16   hey, you've got a lot of people getting ready to

17   retire, let's go ahead and see if we can start

18   recruiting for this type of position, because it's a

19   difficult position.

20              So we tried to squeeze it into an

21   educational model, which is why now I'm managing that

22   aspect.  I have six business partners under me, and

23   that was after I served as that for two years and then

24   moved from there to the interim manager, because our



1    manager left in 2016.

2    Q.            Got you.  And then after interim manager

3    of Recruitment --

4    A.            (Interposing.)  Then became manager.

5    Q.            Then you became the manager?

6    A.            Yes, ma'am.

7    Q.            Even when I was still teaching in 2007,

8    there was a shortage of teachers.

9    A.            Uh-huh (affirmative).

10   Q.            Is there still a shortage of teachers?

11   A.            In certain areas, yes, in certain areas.

12   People are not going into -- when we say shortage, you

13   have to define, you know, the parameters of shortage.

14   Shortage could be because of the subject area, like

15   SPED, Spanish, math are areas that are hard to fill;

16   or it could be because of options that are available.

17                 Back in the day Shelby County Schools and

18   Memphis City Schools were competing against each other

19   salary-wise.  We paid a dollar more than Memphis City

20   Schools.  So it was our kind of pitch, you know, you

21   can buy a Coke and have a job; but now they've got

22   more options.  They've got, you know, charter schools,

23   private schools, you know, and the municipalities.  So

24   that may create a shortage as well, because now people



1    can kind of go wherever they -- have other options

2    available to them now.

3    Q.              In our County we're told that they're

4    having a hard time getting good qualified teachers.

5    Is that the struggle here as well?

6    A.              Not so much.  Qualified, no, not so much.

7    We've got -- you know, math, yes, you've got -- may

8    have to go and get a permit person --

9    Q.              (Interposing.)  Right.

10   A.              (Continuing.)-- to do it; but, yes, we

11   pretty much -- we're good to pull people who are

12   qualified.

13   Q.              Did you fill all your positions as of the

14   fall of 2018?  Were you able to find --

15   A.              (Interposing.)  No, we had --

16   Q.              (Continuing.)-- qualified people?

17   A.              We had a rate of -- we had only sixty

18   positions that were left uncovered out of the entire

19   -- out of a hundred fifty-four schools, obviously not

20   all.  You know, some schools are fully staffed, but we

21   had a success rate of about 97 percent.

22   Q.              So the 97 percent left sixty positions

23   unfilled?

24   A.              Yes, yes, pretty much.



1    Q.           Yesterday I requested a list -- I

2    requested Ms. Branch to have a list printed out of the

3    jobs that Sonya Williams had applied for since the

4    beginning of 2016 or that were on -- the open job

5    applications that she had since the beginning of 2016.

6    A.           Okay.

7    Q.           And I'm going to show you the document

8    that I was given yesterday afternoon, which looks

9    different than the one we've just marked as Exhibit 2.

10                        MR. McGAHA:  You were given

11               that today.

12                        MS. LUNA:  Oh, yes.  I asked

13               for it yesterday and was -- it was given

14               to me today.

15                        THE WITNESS:  Okay.

16   BY MS. LUNA:

17   Q.           Let me make that clear.  Yes, I asked for

18   it yesterday during Ms. Branch's deposition, and then

19   I was handed this document today.

20                Could you identify for me what this

21   document is?

22   A.           So it shows the vacancy I.D., which is

23   the year, which would be 2017-2018.  I don't think it

24   would have anything in here for 2016, because we were



1    transitioning from SearchSoft to iCIMS; but it may be

2    something in here, but I do not -- I don't see 2016.

3              So the first column is the vacancy I.D.,

4    which gives you the year; and then the system

5    generates kind of a number to go after that, so the

6    year and then a kind of an identification number

7    afterward; and then it has the vacancy title, which

8    all of these titles are -- yes, they're related to our

9    District and has the person's full first name and last

10   name looks like and then has a date that they applied,

11   yes.

12   Q.        Let me make sure I'm clear about what you

13   just said.  Are you saying that Dr. Williams could

14   have applied for some jobs in 2016 that would not be

15   on this list because you changed the software?

16   A.        Yes, ma'am.

17   Q.        Okay.  Is there any way for you to

18   retrieve those jobs?

19   A.        I don't have those archives, that archive

20   ability.  I'm not certain if they did archive all of

21   SearchSoft.  There may be some records that they can

22   pull, but that wouldn't be in my department.  That's

23   in Enterprise Department.

24                        MS. LUNA:   I'd like to have



1                    this marked as Exhibit 3.

2                         (Whereupon, Exhibit 3 was

3                    marked as an exhibit to the deposition of

4                    the witness and can be found among the

5                    deposition exhibits attached hereto.)

6    BY MS. LUNA:

7    Q.           I want to next ask you about the Board

8    resolution October the 30th of 2018 which excessed

9    employees.  I have been told that you were the one who

10   drafts the list of excessed employees to attach to

11   those resolutions, to the 2016 resolution and 2018

12   resolution.

13                        MR. McGAHA:  No.

14   BY MS. LUNA:

15   Q.           Is that correct?

16                        MS. LUNA:  Let him answer.

17   BY MS. LUNA:

18   Q.           Is that correct?

19                        MR. McGAHA:  You are

20                   misrepresenting.  You weren't told that.

21                        MS. LUNA:  Let's go off the

22                   record, please.

23                        (Off the record discussion.)

24   BY MS. LUNA:



1   Q.              Well, instead of me looking for it, I'll

2   take another break in just a minute; but instead of me

3   looking for it, let me just rephrase my question.   I

4   think that will be easier, Dr. Jones.

5                   Dr. Jones, do you have anything to do

6   with the list of teachers that are attached to the

7   resolutions in 2016 and 2018 that excessed teachers to

8   the reduction in force policy?

9   A.              Ask that question again.   I'm sorry, I

10  was distracted by some things going on.

11  Q.              Sure.   There were resolutions passed by

12  the Board in October of 2016 and October of 2018.   Are

13  you familiar with those resolutions?

14  A.              I am not familiar with those resolutions.

15  Q.              Okay.   Let me show you --

16  A.              (Interposing.)   Sure.

17  Q.              (Continuing.)-- those resolutions.

18                        MR. McGAHA:   Teresa, I believe

19                  I found what you're talking about.

20                        MR. COBB:   What page?

21                        MR. McGAHA:   Page 35.   That's

22                  the only place I see his name mentioned,

23                  and it's not with respect to the lists;

24                  page 35.



1               MS. LUNA:  His name is

2          mentioned several times in there, but let

3          me just finish my question.

4               MR. McGAHA:  Okay.

5               MS. LUNA:  I think we can --

6               MR. COBB:  (Interposing.)

7          Whose name is it?

8               MS. LUNA:  Eddie Jones.

9     BY MS. LUNA:

10    Q.        I'm going to show you Exhibit 2 from

11    Chantay Branch's deposition yesterday.  This is a copy

12    of the 2016 resolution excessing teachers, and behind

13    that resolution are three lists of teachers that were

14    excessed; and it's called the Reduction in Force List.

15    A.        Okay.  So they were RIFed, not excessed.

16    They were excessed, but then eventually RIFed.

17    Q.        Thank you for clearing that up, yes.

18    A.        Okay.

19    Q.        Yes.  People have been -- in this case

20    we've been calling them the excessed teachers.

21    A.        Sure.

22    Q.        But you're right.  They're the teachers

23    that were -- that lost their jobs as a result of the

24    reduction in force.  Do you have anything to do with



1    preparing these lists?

2    A.          Yes.  So our office does.

3    Q.          Okay.

4    A.          Our office.  Our office generates -- my

5    business partners that I spoke of earlier work with

6    principals, and during budget checkout they identify

7    any positions that will be excessed.  As a result of a

8    position being abolished, closed, excessed, what have

9    you, if a person is in that position currently, then

10   that person then is deemed as being excessed.

11              They have an opportunity then to apply

12   for jobs through the transfer period; and then at that

13   point if they have not secured a position by the start

14   of the school year -- actually before start of school

15   year, by the end of the fiscal year, then their names

16   are then submitted as reduction in force.

17   Q.          Okay.

18   A.          And that was -- that would be 2016.

19              MS. LUNA: I'd like to make --

20              the Exhibit 2 to Chantay Branch's

21              deposition, I'd like make it Exhibit 4 to

22              Dr. Jones's deposition.

23              (Whereupon, Exhibit 4 was

24              marked as an exhibit to the deposition of



1              the witness and can be found among the

2              deposition exhibits attached hereto.)

3    BY MS. LUNA:

4    Q.              Okay.  That brings up several questions

5    that I have regarding those excessing lists.  You

6    mentioned the -- and Ms. Branch was explaining it to

7    us yesterday as well, that you're excessed when the

8    School System knows that it's going to lose some

9    positions; and then I think you're explaining to me

10   that the School System then helps the teachers to try

11   to find other jobs within the School System until

12   June 30th of that year, as I'm understanding it,

13   according to the policy.

14              Correct me if I'm wrong.

15   A.              Yes, well, what our District does is we

16   host job fairs, we create transfer windows, and we

17   provide the climate for them to apply for positions if

18   their position has been abolished or excessed due to

19   either loss of funds or generated like a change of

20   program, anything -- any of those could fall in that

21   arena.

22              And so then, yes, we don't directly place

23   individuals in a position, but we create the

24   atmosphere where they can successfully apply for



1    positions; and we do try to create opportunities like

2    job fairs, several job fairs to attend, and, you know,

3    get -- secure a position before the new year.

4    Q.          Now, I also understand that there are two

5    internal policies, one for certificated employees and

6    one for noncertificated employees as to the excessing

7    protocol.  I asked that to Chantay Branch yesterday,

8    and she gave me a -- or, we talked about a document,

9    and I'm showing you what was Exhibit Number 11 in

10   Chantay Branch's deposition; and it's the Certified

11   Position Abolition Policy.

12              Are you familiar with this policy?

13   A.          Yes.  Certified position, that being

14   someone who holds a certificate teaching, and that

15   their position has been abolished or excessed or -- we

16   call it a number of things, yes.

17   Q.          Which one of the policies, the Certified

18   Position Abolishment or the Noncertified Position

19   Abolishment, would apply to someone who is certified

20   but not in a standard teaching position?

21   A.          Okay.  So they're certified, but they're

22   not in a certified teaching position.  So, like, if

23   they were in a -- say, for instance, they had an

24   English endorsement, they had taught for a couple of



1    years, and then they decided to come out of the

2    classroom, I'm going to be a SPED assistant --

3    Q.           (Interposing.)  Let me give you a

4    different example that's applicable to this case.

5    A.           Okay.

6    Q.           Dr. Williams goes into an advisor

7    position which requires a certification, she's in that

8    position in 2015 and '16, she's in the Adult Education

9    advisor position which requires a certification, okay?

10   So would -- would the Certified Position Abolishment

11   Policy apply to her or the Noncertified Position

12   Abolishment Policy apply to her?

13   A.           If she requires a certification, it would

14   be certified.

15   Q.           Okay.  Okay.  That's all I needed

16   clarification on; and I think -- and I'll give you a

17   second to look at this, but I think this is what you

18   were explaining to me a few minutes ago, that, you

19   know, the System helps them -- you know, provides them

20   some opportunities maybe for transfer.  I think it's

21   -- I think we were looking at maybe the first --

22   A.           (Interposing.)  First two pages.

23   Q.           Yes, the first two pages of this packet

24   that I've handed you.



1    A.              Yes, interviews, excessing notification,

2    yes.

3    Q.              Okay.  A minute ago you made a

4    distinction between excessing or RIF or reduction in

5    force.  Tell me how that would work with Dr. Williams

6    as far as the letters that she would -- should have

7    received or did receive in 2016 when her program that

8    she was working for when the funding was withdrawn

9    from that program.

10   A.              Okay.  So I'm not familiar with that.  So

11   I'm going to kind of talk from the standpoint of what

12   we normally do or --

13   Q.              (Interposing.)  That's exactly what I

14   want.

15   A.              Okay.

16   Q.              February of 2016 the program that she was

17   working in, the funding was pulled by the State of

18   Tennessee; and the -- they lost the funding in March

19   of that particular year.  Talk me through the protocol

20   of what happens to an employee, certified employee

21   like Dr. Williams at that point.

22   A.              Wow.  In February?

23   Q.              Yes.

24   A.              Not at the end of the school year?



1    Q.              Right.

2    A.              So I don't know if I've dealt with this

3    one or not before, a situation like this, because

4    normally our stuff happens where they finish out the

5    course of the year and then even in the midst of that

6    they -- they still have time to locate positions and

7    we notify them.

8                    So in her case, loss of funding in

9    February would mean that someone from HR would notify

10   her and those that were involved of the position being

11   abolished or their positions being abolished, would

12   then have conversation about what opportunities are

13   coming up.  Obviously I can't think of a time when we

14   had transfer season that early.

15                   So I'm not certain how I can answer that

16   question, because generally, like I said, they're

17   still employed; but if you're saying they're pulling

18   funding and they have no job as of day one and not

19   days later, then they would have been -- I don't know.

20   I can't answer that.  I don't know.

21   Q.              When would -- when would Dr. Williams

22   receive an excessing letter and when would she receive

23   the RIF letter as you're --

24   A.              (Interposing.)  I'm not certain if she



1    would receive in this case -- that's what I'm saying

2    I'm lost on, because that's a new one on me.  I would

3    have to actually literally sit down with everybody

4    involved and say how are we going to structure this,

5    because it's not like what we normally do.

6    Q.          Okay.

7    A.          We normally give an excess letter first

8    that says you have an ESC, this is called Employee

9    Status Change Form, to notify you that your position

10   has been abolished for next year, please give us your

11   information so that we can, you know, keep up with you

12   and let you know when job fairs are coming and X, Y,

13   Z.

14   Q.          If there are open jobs at that particular

15   time that they're qualified to go into --

16   A.          (Interposing.) Yes.

17   Q.          (Continuing.)-- would there be every

18   effort to help them get into those jobs?

19   A.          Yes.

20   Q.          Okay.

21   A.          I mean, when we say help, you know, we

22   would provide the opportunity for them to apply and,

23   you know, coach them on how to apply; but we're not an

24   employee -- we're not an employment agency, so we



1    don't just find jobs for folks.  We provide the

2    opportunity for them to be promoted, to get, you know,

3    information on how to apply for a lateral move and

4    things of that nature, transfers.

5    Q.          Okay.

6    A.          Yes.

7    Q.          Are you the person that's familiar with

8    the reemployment list, the preferred list for

9    reemployment for certified and tenured teachers?

10   A.          Yes.

11   Q.          Okay.  I was given a list yesterday or

12   document yesterday that I am -- I don't know what it

13   is, and so I've been told that -- I think I've been

14   told that you are the one that will be able to help me

15   out with this.

16   A.          Sure.

17   Q.          But before I do that, let me make what

18   was made Exhibit 11 yesterday -- the Certified

19   Position Abolishment Policy, let me make it the next

20   exhibit, which I think is Exhibit 5, in your

21   deposition.

22                       (Whereupon, Exhibit 5 was

23                       marked as an exhibit to the deposition of

24                       the witness and can be found among the



1              deposition exhibits attached hereto.)

2    BY MS. LUNA:

3    Q.              Now, I want to hand you this list that I

4    was handed yesterday that I don't know what it is.

5    Can you identify this document for me?

6    A.              Yes.  This is my Excel file that I

7    generated August, and I've been adding to it and

8    taking away and just kind of modifying as we go along.

9    It is what I call a reemployment list, but it's not.

10   It's an excess -- it's a teacher -- teachers who have

11   been identified in our District who have been excessed

12   who did not secure a position by the school year; and

13   so what we ended up doing was deploying these

14   individuals out to various schools that had vacancies.

15              Since we didn't fill all vacancies, we

16   had sixty still left, we deployed some of those

17   excessed teachers, because we were instructed by our

18   Superintendent that we did not need to RIF again this

19   year.

20   Q.              Okay.

21   A.              We did not RIF anyone this year, we did

22   not RIF anyone last year.

23   Q.              So for the 2018-'19 school year there was

24   no one RIFed?



1    A.            No.

2    Q.            And for the 2017-'18 school year there

3    was no one RIFed?

4    A.            No.

5    Q.            So the last group of teachers who were a

6    part of a reduction in force were the teachers from

7    '16-'17?

8    A.            Uh-huh (affirmative).

9    Q.            Is that yes?

10   A.            Yes.

11   Q.            Okay.  When you say uh-huh

12   (affirmative) --

13   A.            (Interposing.)  Okay, yes.

14   Q.            (Continuing.)-- she doesn't know how to

15   write down --

16   A.            (Interposing.)  I'm sorry.  That's the

17   South in me, I'm sorry.

18   Q.            So the Court won't be able to know if you

19   meant yes or no.  I'm sorry, I don't mean to correct

20   you.

21   A.            May I use certainly?

22   Q.            Certainly.  Okay.  So this list, when was

23   this list made?

24   A.            This list was actually made September,



1   October, somewhere around that time, because I wanted

2   to make sure certain that I was keeping up with

3   people, because we were having folks who were

4   resigning, people who were deployed; and I was just

5   trying to find some central location for everything to

6   be since we're not utilizing Zoho any longer.

7   Q.          So is this list effective today?

8   A.          It is effective today, yes.

9   Q.          Okay.

10  A.          It's a moving document, living document.

11  Q.          Okay.

12  A.          Uh-huh (affirmative).

13  Q.          How long has Dr. Williams' name been on

14  the list?

15  A.          Her name has been on there for about

16  three weeks.

17  Q.          Okay.

18  A.          Yes, about three weeks; and that -- yes,

19  I included her name, as you can see, at the very top.

20  So anything that's at the top, that's the most recent.

21  I just create another insert.

22  Q.          I think you're telling me that it's a

23  fluid, ever changing document?  Is that what you're

24  saying?



1    A.              It's an Excel file, uh-huh (affirmative).

2    Q.              Excel file?

3    A.              Uh-huh (affirmative).

4    Q.              And as names go on it or are taken off of

5    it, it changes, correct?

6    A.              Yes.

7    Q.              Okay.  So you're saying that

8    Dr. Williams' name was put on there about three weeks

9    ago?

10   A.              Yes, ma'am, uh-huh (affirmative).

11   Q.              Was that the first or second week of

12   January or second week of January?

13   A.              It had to have been when we got back from

14   vacation -- I mean, from the Christmas holidays, yes.

15   Q.              What prompted her name to be put on it at

16   that time?

17   A.              I received notice from -- who was it

18   from?   I don't know if it was from Jennifer or Labor.

19   I received notification from someone that her name

20   needed to be identified as being on our reduction --

21   not reduction, but our reemployment list.

22   Q.              Okay.

23   A.              And so since we didn't have a

24   reemployment list and I had this, I just added her



1    name on there so I could keep up with it.

2    Q.          Okay.

3    A.          Yes.

4    Q.          Has she been deployed to any other school

5    that you know of?

6    A.          No, unh-unh (negative), not at this

7    point.

8    Q.          There seems to be some comments on the

9    second page.  Are those the comments that go with each

10   one of those?

11   A.          Yes, ma'am.  Yes, ma'am.

12   Q.          And I -- I unstapled it so we could look

13   at that.

14   A.          Sure.

15   Q.          But let's start at the bottom.  The name

16   is Carolyn Shepard --

17   A.          Uh-huh (affirmative).

18   Q.          (Continuing.)-- Haywood.  She's on the

19   list, and it said deployed to Belle Forest Elementary?

20   A.          Uh-huh (affirmative).

21   Q.          That means that she was -- she was a

22   victim, let's call it, of a reduction in force, but

23   yet you've deployed her to another school, correct?

24   A.          She was excessed, but she was not reduced



1    -- she was not --

2    Q.          (Interposing.)  Oh, I see.

3    A.          She was not -- she -- none of these

4    individuals separated from our District by way of the

5    contract.  Their contract continued.

6    Q.          Okay.

7    A.          And so because of that, they're really

8    not reemploying.  We're not reemploying them.  We're

9    just deploying them to another area, because we're not

10   going to -- we decided not to RIF them.

11   Q.          So if I understand correctly, you're

12   telling me there is two steps in the RIF process; and

13   I'm sorry your wrist is hurting you.

14   A.          You're fine.  You're fine.

15   Q.          There are two steps in the RIF process?

16   A.          Uh-huh (affirmative).

17   Q.          One is -- the first step is excessing,

18   and then you try to place them somewhere else?

19   A.          Yes.

20   Q.          And then if you can't find a place for

21   them, then they are a victim of RIF, correct?

22   A.          They are RIFed if the District makes a

23   decision to move forward with RIFing, yes.  That's

24   when we would do it, at that time.



1    Q.          Okay.

2    A.          At that juncture.

3    Q.          So this last lady on here, Carolyn

4    Shepard-Haywood, she never got RIFed -- she was

5    excessed, but she never got RIFed because she was

6    deployed to another school?

7    A.          Yes.

8    Q.          Is that correct for Cassaundra Gardner as

9    well?

10   A.          Uh-huh (affirmative).

11   Q.          And is that correct for Vera Alexander?

12   A.          Yes.

13   Q.          And for Tina Lumley?

14   A.          Yes.

15   Q.          And for Stacy Lowe?

16   A.          Uh-huh (affirmative).

17   Q.          And then is that correct for, I'm reading

18   upside down so I'm sorry, Nancy Weathers?

19   A.          Yes.

20   Q.          And for Ike --

21   A.          (Interposing.)  Hentrel.

22   Q.          (Continuing.)-- Hentrel?

23              And for --

24   A.          (Interposing.)  George Ross.



```
 1    Q.           George Ross.  And for --

 2    A.           (Interposing.)  Emily Thomas.

 3    Q.           (Continuing.)-- Emily Thomas?

 4    A.           Uh-huh (affirmative).

 5    Q.           And for Dana Chiozza?

 6    A.           Chiozza.

 7    Q.           And for Alisa Richardson?

 8    A.           Yes.

 9    Q.           And for Alfreda Kizer?

10    A.           Uh-huh (affirmative).

11    Q.           Is that a yes?

12    A.           Yes.

13    Q.           And for --

14    A.           (Interposing.)  Teresa McGuire.

15    Q.           Teresa McGuire.  And for Sonja Dotson?

16    A.           Yes.

17    Q.           And there is another note beside this --

18    beside Brenda Key?

19    A.           Harry Key.

20    Q.           Harry Key.  Oh, I'm sorry, Harry Key.

21    What is that note?

22    A.           He was originally hired as a TOSA in

23    2017-'18.

24    Q.           Okay.  Tell me what a TOSA is.
```



1    A.              TOSA stands for teacher on special

2    assignment.

3    Q.              Okay.

4    A.              And a TOSA can be one of two things.

5    TOSA could be someone who we hired at the beginning of

6    the summer with the explicit purpose of providing us

7    teacher support throughout the year.  We contract them

8    for an entire year; and during that year if there is a

9    maternity leave, medical leave, or any type of absence

10   where a vacancy occurs, we deploy that person to that

11   position until either the person returns or until the

12   principal decides to hire someone else.

13              If either of those happen, then we will

14   take the person and redeploy them to another position

15   that's comparable to their area of endorsement.

16   Q.              Okay.  So Harry Key --

17   A.              (Interposing.) Yes.

18   Q.              (Continuing.)-- was not a tenured

19   teacher?

20   A.              He was originally a TOSA that we had

21   employed the previous year.

22   Q.              But not a tenured teacher?

23   A.              Not a tenured teacher.

24   Q.              Okay.



1    A.            But we brought him back again as a TOSA

2    again.

3    Q.            So he's still working for the School

4    System?

5    A.            He's still working for the System, yes.

6    Q.            And then the next one is Brenda Becton?

7    A.            Uh-huh (affirmative), yes.

8    Q.            It says RIF for Cordova as an assistant

9    principal?

10   A.            Yes.

11   Q.            What is her current situation?

12   A.            It looks like she's been deployed, and

13   I'm not certain what she's deployed as.  Brenda

14   Becton, I'm not familiar with that name.  So I would

15   have to look it up in Apex to determine where she is

16   now.

17   Q.            Okay.  But she's still within the School

18   System?

19   A.            I would assume so.

20   Q.            Okay.

21   A.            I don't have on here that she's resigned

22   like the next person, Anna Godwin, who actually has

23   resigned.

24   Q.            Okay.  So I'm going to -- we'll take a



1    break in a minute.

2    A.          Sure.

3    Q.          And I'll have you to -- if you don't mind

4    looking up Brenda Becton and tell me what her current

5    status is.

6    A.          Sure.

7    Q.          And the next one up the list is Anna

8    Godwin, and you said that she resigned from the School

9    System?

10    A.          She did.

11    Q.          Okay.  And then the next one up the list

12    is Ronald Cody?

13    A.          Yes.

14    Q.          And he's been deployed to Whitehaven

15    School?

16    A.          Yes.

17    Q.          Okay.  And then the next one is -- the

18    top one on the lift is Sonya Williams, and --

19    A.          (Interposing.)  Yes.

20    Q.          (Continuing.)-- the note beside hers

21    says?

22    A.          Settlement awarded.

23    Q.          Okay.  Explain that.

24    A.          Well, I was just instructed, again, that



1   this was a situation that involved litigation and that

2   she needed to be placed on the Reduction in Force

3   List, which I don't have a Reduction in Force List.  I

4   have a list of names that I keep up with for excess

5   purposes so I can track who needs to be sent out and

6   who's active and who's out there.

7   Q.          Okay.  I guess the question is why the

8   term settlement awarded?

9   A.          And, again, since it was a personal Excel

10  file, I put that on there because that was the best I

11  could come up with.  Instead of saying litigation and

12  all that, I just said settlement award.

13  Q.          That she was placed on a reemployment

14  list due to a settlement?

15  A.          No, that was just my comments.  I wanted

16  to make certain that I knew that this was not a

17  situation where she had been educated as, you know, a

18  classroom teacher last year and that she was

19  continually -- or, she's currently deployed somewhere

20  else.  I wanted to make certain that I could remember

21  that her situation was one that came from General

22  Counsel, and I think it was through General Counsel

23  advised me that she needed to be put on the -- or,

24  asked whether or not she was on that list, and I said



1    no.

2    Q.          And she had not been on the list up until

3    three weeks ago, correct?

4    A.          Not on a -- not on a Reduction in Force

5    List -- I mean, not on a preferred reemployment list

6    that I have.

7    Q.          Okay.

8    A.          Because to date -- well, prior to now the

9    reemployment list was kept in Zoho, and we no longer

10   have access to Zoho.  So I'm not certain -- the last

11   two years we've not had a reemployment list, but going

12   back to 2016 we don't -- I don't have any archives of

13   Zoho back then.

14   Q.          Okay.  But they're telling you now to put

15   her on the reemployment list?

16   A.          Well, they -- they didn't tell me.  They

17   just asked if she was on the list; and I said, no,

18   she's not; and they said, well, this is a situation in

19   litigation, so let's make certain that you are aware

20   of the fact that she is.

21                    MS. LUNA: I'd like to make

22                    these two pages the next exhibit, please.

23                    (Whereupon, Exhibit 6 was

24                    marked as an exhibit to the deposition of



1               the witness and can be found among the

2               deposition exhibits attached hereto.)

3                    MR. COBB:  In Excel

4               spreadsheets they have the line numbers

5               out to the left, Teresa?

6                    MR. McGAHA:  We could probably

7               produce it that way if you need to.

8                    MR. COBB:  I just was

9               wondering.  How many lines are there on

10              each one?  You might want to just mark

11              the first one.

12                   MS. LUNA:  I think I just went

13              through each one and clarified it on the

14              record, which one went with which one.

15                   MR. COBB:  Okay.  I'll shut up.

16                   MS. LUNA:  Off the record just

17              a moment.

18                   (Off the record discussion.)

19      BY MS. LUNA:

20      Q.          Dr. Jones, are you or any -- are you here

21      to answer questions about the letters, the excessing

22      letters or the reduction in force letters, that are

23      sent to people who are the victims of an excessing or

24      reduction in force?



1    A.                 Please re--

2    Q.                 (Interposing.)  Let me rephrase, sure.

3    Does that come from your department, an excessing

4    letter?

5    A.                 So letters are not generated when a

6    person is excessed.  That's an Employee Status Change

7    Form that's given to an employee to complete, sign,

8    what have you; and that then lets us know that

9    person's position has been excessed.  A RIF letter

10   comes by way of Labor Relations to my knowledge.

11   Q.                 Okay.  So that would be Chantay Branch?

12   A.                 Yes, ma'am.

13   Q.                 Okay.  Now, now that Dr. Williams is on

14   that list for reemployment, what happens now?

15   A.                 Well, what we typically do is the

16   positions that that person has applied for -- if this

17   were a reemployment list by way of what Zoho was,

18   truly these people were reemployment, they would be

19   sent out for interviews with principals, because our

20   District is not one of direct placement.

21                     We have mutual consent that we're

22   governed by.  So unlike the days of when you and I

23   taught where if you lost a position, you were placed

24   in a position if you didn't secure one on your own, we



1  have mutual consent which says the applicant and the

2  principal must agree on the placement.

3           So what we would typically do is my team

4  of recruiters would then have knowledge of this person

5  and say, okay, let's look at what they've applied for;

6  and then whatever they've applied for by way of a

7  teaching position, then we will send them to that

8  principal to interview; and hopefully the interview

9  will go well, and the principal will make a

10 recommendation.

11          In the case of these individuals that

12 were deployed, we had been sending them out, but they

13 were still not able to secure something; and so

14 because we had vacancies and they needed a job, rather

15 than sitting at home because we were not RIFing them,

16 we deployed them to those positions.

17          So at this point in juncture if there is

18 a vacancy that's in her area of endorsement and she's

19 applied for that teaching position, we can do one of

20 two things.  We can either deploy because the

21 principal needs someone right now and they haven't

22 been able to select someone so this person is

23 temporarily to your building until you either hire

24 them, make a recommendation for it and they agree on



1   it, or until you find someone else and then we'll

2   redeploy her; or we'll look at the list of places

3   where she has applied to and then begin to say, hey,

4   Principal, we've got a person that's interested in a

5   position that you have, we would like to include her

6   in this lineup of names that we're sending to you and

7   ask that you, you know, give some special attention to

8   making certain that you grant her an interview.

9   Q.          Since Dr. Williams has been put on this

10  list, what efforts have been made to send her

11  applications to principals or to other departments for

12  which she's qualified for a position that's open?

13  A.          Well, none at this point.  No positions

14  have we worked with her at the teach-- because I staff

15  teachers.  I don't staff central office positions or

16  the administrative type positions.

17  Q.          Okay.

18  A.          So that's why when -- at the beginning

19  when you asked me what I had looked at or what I had

20  reviewed, I wanted to make certain that I did not miss

21  this person with regard to teaching positions, because

22  right now that's my charge.

23  Q.          Okay.

24  A.          Just to make certain that all kids have a



1    teacher in front of them.  I did not see where she had

2    applied for any teaching positions.  So since she's

3    been on this list, she has not been sent out to --

4    none of my recruiters have sent her out to any

5    vacancies that may be in her area of endorsement.  All

6    I saw were positions that were more central office or

7    administrative, and I don't staff those.

8    Q.           Okay.  So you're saying there are no

9    positions that are teaching positions that she's

10   applied for?

11   A.           Not that I saw in iCIMS.  Now, I can go

12   back through again tonight, but my last recollection

13   was that there were, like, sixty some odd positions

14   that she had applied for.  I didn't see any of those

15   as being a teacher.  I was hoping that she was a math

16   teacher, because I could get her employed, like, right

17   now.  I could send her out to several positions.

18                Even if she spoke Spanish and she just

19   had rusty Spanish, I could send her out if she had the

20   endorsement and hopefully a principal would at least

21   accept her as a deployment or either at least give her

22   a chance to go through the interview process and then

23   hopefully, you know, make a recommendation from that.

24                But none of those did I see any positions



1   where she had applied for that were teaching.

2   Q.          Since the beginning -- I'll represent to

3   you since the beginnings of 2016 she's had over a

4   hundred and ten positions that she's applied for.

5   A.          Okay.

6   Q.          And some of those have been teaching

7   positions.  But you're saying that until three weeks

8   ago it didn't come to your attention that she should

9   have been referred to a principal to have her

10  application looked at, correct?

11  A.          Okay.  So let me -- say the first part

12  again, because you said since?

13  Q.          Sure.  Since the beginning of 2016 --

14  A.          (Interposing.) Uh-huh (affirmative).

15  Q.          (Continuing.)-- Dr. Williams has applied

16  for over a hundred ten jobs, and some of those were

17  teaching positions.  You're just saying that until

18  three weeks ago it didn't come to your attention,

19  correct, that she needed to be -- her job applications

20  needed to be sent to a principal?

21                    MR. McGAHA:  Object to form.

22  BY MS. LUNA:

23  Q.          Is that what you're saying?

24  A.          Yes.  So the first part I can't clarify.



1    I don't see that she's applied for a hundred some odd

2    positions.  Now, it may be because she applied for

3    some positions in SearchSoft; but the positions that I

4    see that she's applied for in iCIMS, none of those are

5    teaching positions.

6              So, again, I wanted to -- because it

7    didn't seem like the two were connected.  So I was

8    trying to make certain that I answered that first

9    part.  The second part you said was it was three weeks

10   ago that it was brought to my attention that she

11   needed to be looked at as a potential person to go out

12   for positions to apply for.

13   Q.         Yes.

14   A.         Yes, that is correct.

15   Q.         So let me rephrase the first part of the

16   question again.

17   A.         Okay.

18   Q.         If a position, a teaching position were

19   open in 2016 but not open now, would -- that

20   application wouldn't still be -- you wouldn't be

21   looking at that application, would you, if the

22   position is no longer open?

23   A.         Yes, no, well, I'd still be able to see

24   it.



 1    Q.          Okay.

 2    A.          I could pull up every job that she's

 3    applied for; and if it's closed or still open, I still

 4    would be able to see that she applied for that

 5    position.

 6    Q.          Okay.

 7    A.          The only exception would be anything

 8    prior to iCIMS.  I would not be able -- I would have

 9    to look at the archived data for SearchSoft.

10                     (Off the record discussion.)

11    BY MS. LUNA:

12    Q.          Mr. Cobb is making a good point to me,

13    and that is if you were to go online, not us, but if

14    you were to go online into your system, how do you --

15    without telling us any passwords or anything, how do

16    you get in your system to --

17    A.          (Interposing.)  I use my user name and

18    password.

19    Q.          Okay.

20    A.          I have manager rights; and so I can look

21    at the entire system, and I can manipulate the system

22    in the sense of pulling up a file that shows how many

23    have applied for this position, how many have applied

24     for this position, and send that to the principal and



1    say that these people have applied.

2    Q.            I see.  This list that we made Exhibit 3

3    to your deposition, which is the list that was

4    generated by the School System of the jobs that Sonya

5    Williams has applied for, where on here does it say

6    that the position has been filled already or it's a

7    closed position, or is this a list of open positions?

8    A.            Yes, that's just -- no, this is -- this

9    is obviously something that has been printed from --

10   like, just pulled from the system and then not the

11   actual full-fledged -- because the full-fledged system

12   would have -- like, if it had her name, it would have

13   -- let me see.  I'm trying to think.

14               There were some other columns that they

15   would have on here.  It does show that she -- when she

16   applied, shows her name, shows the title, and shows

17   the vacancy; but there are some other aspects.  I

18   think there are some other areas, like, columns that

19   you could actually -- I could limit the columns or I

20   could expand them all out, but I wouldn't be able to

21   get them all on this sheet.  So I don't know how that

22   was framed.

23   Q.            Okay.

24   A.            So yes.



1   Q.          Okay.  All right.  If a principal has

2   refused a transfer or refused to take a teacher in

3   that mutual consent protocol that you were speaking

4   about a minute ago, would there be a record of that in

5   the teacher's personnel file?

6   A.          No.

7   Q.          Where would that record be?

8   A.          Well, there wouldn't be a record per se.

9   If I sent five people to interview and the principal

10  decided of those five I want you to send me another

11  five, I'd send another five; and then of that five he

12  selects one of that five, the other nine people, there

13  wouldn't be a record of anything showing that

14  principal didn't decide on this person.  It just shows

15  in our system that this is the person that was

16  recommended, and then the position closes.

17  Q.          Okay.  Do you know of any principal

18  that's refused to take Dr. Williams in any position

19  since 2016?

20  A.          Not that I'm aware of.

21  Q.          Do you know of any determination of

22  Dr. Williams' level of effectiveness to be in any of

23  these positions?

24  A.          Not that I am aware of, no.



1    Q.              Do you know of any determination of her

2    competency, suitability that was done to be in any of

3    those positions?

4    A.              No.

5    Q.              Okay.  Are you the keeper of the list of

6    reemployment -- list for reemployment for teachers for

7    certified positions?

8    A.              Our office does keep a list of

9    individuals that would be on the reemployment list;

10   but, again, I don't have a current reemployment list.

11   I have a list of names of people who have been

12   excessed.

13   Q.              Okay.

14   A.              But in the past our office has kept that

15   reemployment list in Zoho.

16   Q.              Okay.  I think I'm about through.  I'm

17   going to take a break just a minute and speak to --

18                        MR. McGAHA:  (Interposing.)  Go

19              off the record?

20                        MS. LUNA:  Please.

21                        MR. McGAHA:  Okay.

22                        (Whereupon, a break was taken.)

23                        MS. LUNA:  Before we adjourn

24              the deposition, I want to ask Dr. Jones



1                    if he would not mind -- there was one

2                    question that we had from Exhibit

3                    Number 6, the preferred list for

4                    reemployment; and it concerned -- let me

5                    find the name -- Brenda Becton.

6      BY MS. LUNA:

7      Q.           And I believe you had told me that you

8      would not mind finding out about Brenda Becton, who

9      was a RIF for Cordova as assistant principal.

10                       MS. LUNA:  And if we can

11                   adjourn for a few minutes and allow him

12                   to do that, then I should be close to

13                   done.

14                       MR. COBB:  Would we need to let

15                   the General Counsel know, or is she in

16                   the building?

17                       MR. McGAHA:  She is in the

18                   building.  I told her it would probably

19                   be closer to 2:30 or 3:00.  I thought it

20                   might be a little longer, but I can try

21                   to get her sooner.

22                       (Off the record discussion.)

23                       MS. LUNA:  Okay.  Let's go back

24                   on the record.  We've been off the record



1               while Dr. Jones graciously searched his

2               system to find out about Brenda Becton,

3               who is on the reemployment list, which is

4               Exhibit Number 6.

5    BY MS. LUNA:

6    Q.          And, Dr. Jones, if you would, tell us

7    what you have discovered about Brenda Becton.

8    A.          Brenda Becton is a classroom teacher

9    currently in our District who is active.

10   Q.          Okay.  So she is -- has been deployed as

11   well?

12   A.          She's been deployed as a regular

13   classroom teacher, yes.

14   Q.          Okay.  Thank you.

15               MS. LUNA:  And that's all the

16               questions I have.

17               MR. McGAHA:  All right.  I have

18               a couple of things.

19               CROSS EXAMINATION

20   BY MR. McGAHA:

21   Q.          Dr. Jones, you testified earlier that

22   Dr. Williams, Sonya Williams, had been placed on a

23   reemployment list and that she had been placed on a

24   reemployment list at the direction of General Counsel;



1    is that correct?

2    A.             Yes, I did testify to that.

3    Q.             Okay.  You later testified that there is

4    not a reemployment list in a sense because no one --

5    there haven't been any reductions in force in the last

6    two years?

7    A.             Yes.

8    Q.             Is that correct?

9    A.             That's correct.

10   Q.             All right.  So I want to make sure it's

11   clear that Dr. Williams -- is Dr. Williams on a -- on

12   the reemployment list as stated earlier in your

13   testimony?

14   A.             No, she -- and I may have reiterated, but

15   I have an Excel file that tracks all parties that have

16   been excessed and have not secured a permanent

17   position or who were excessed and resigned.  I wanted

18   to keep track of all those individuals.  So I placed

19   her on that list, because that's my one central list

20   of keeping up with everyone.

21             It's not a reemployment list per se.  It

22   is just a list of names of individuals that I wanted

23   to track to make certain that I was keeping up with

24   their nuances of, you know, whether or not -- are they



1    deployed, is it someone I'm going to have to find a

2    permanent position -- help find a permanent position

3    for, is it someone that Labor has given us, because

4    there are some on that list that say Labor deployed

5    and they're not teachers, they were individuals who

6    are nonteachers who were SPED assistants or Ed

7    assistants that had a Labor situation and so,

8    therefore, I need to make certain that we understand

9    this is a different type of placement.

10              So that's just my -- that's my personal

11   list within our department that keeps up with all of

12   the individual one-offs is what we call them that have

13   special circumstances, be it a TOSA, be it someone

14   that's a Labor, be it someone that is a General

15   Counsel; and that's my whole entire list.  So those

16   people make up that list.

17   Q.         Okay.  So what were you directed to do by

18   General Counsel with respect to Sonya Williams?

19   A.         I would have -- and, again, just to be on

20   the safe side, I would have to actually literally look

21   in my e-mail and see if there was any type -- I know

22   there were some e-mails going back and forth between

23   myself and Jennifer Ervin who stated -- she just

24   wanted to know do you have a list of the reemployment;



1   and I stated to her I don't have the reemployment

2   list.  That's not the reemployment list (indicating).

3   I don't have a reemployment list.  It's in Zoho.

4                    When I pull up Zoho for this year, it's

5   remnants of what was left over from -- I don't know

6   what year it was, but there are, like, six or seven

7   names.  So as a result of that I sent that back to her

8   to let her know, hey, I don't have a reemployment

9   list, but this is what's showing in Zoho.

10                   She then asked is there any way, you

11  know, we can get that information; and I said it would

12  have to be something if they archived it, we can get

13  it; and I do remember that e-mail stating that it

14  would come from Enterprise, Donya Hampton.  I did send

15  an e-mail to Donya Hampton.  Donya did attempt to pull

16  archived data from Zoho.  She was unsuccessful.  She

17  said the only thing she had was listings of applicants

18  from budget checkout and some other things, which is

19  another aspect of Zoho.

20                   It took care of a lot of things for us,

21  budget checkout, reemployment lists, resignations,

22  separations, retirements; but all of that started

23  being phased out in 20015-'16, and the only thing that

24  remains now in Zoho is retirements, resignations,



1   separation tracker.

2   Q.          So are you saying that we don't have a

3   reemployment list in Zoho -- we don't have a

4   reemployment list because traditionally the

5   reemployment list was kept in Zoho, but because Zoho

6   was being phased out, that's why we don't have the

7   traditional reemployment list?

8   A.          That's part of it.  The other part of it

9   is that for the last two years we've not RIFed anyone.

10  So there was no need for us to keep a reemployment

11  list.

12  Q.          Got you.  So to the extent that we -- if

13  we have a list of employees that would otherwise be on

14  a reemployment list, because we don't keep one in Zoho

15  --

16  A.          (Interposing.)  Yes.

17  Q.          (Continuing.)-- would that be it?

18  A.          It would not be in Zoho because of the

19  capacity, but this (indicating) would serve as that.

20  It would be an Excel document or for -- we've been

21  dinged lately that Excel or Google Docs are not the

22  safest.  So we are now migrating to SharePoint.

23  Q.          Okay.

24  A.          So that that information would be secure.



1   Q.            And when you said "that" would be it,

2   were you referring to --

3   A.            (Interposing.)  This list.

4   Q.            (Continuing.)-- this document?

5   A.            Yes, the list that I have of names of

6   people who are one-offs, this list of names that were

7   read off from Sonya Williams all the way down to

8   Carolyn Shepard-Haywood.

9   Q.            Is that Exhibit 6?

10  A.            Yes, Exhibit 6.

11  Q.            And I have a couple of other small

12  things.  If someone was not on the reemployment --

13  well, let me back up.  When did you say you started in

14  your current position?

15  A.            Oh, God, it was -- we hired a new

16  director in March of 200-- not '18, '17-'18.  She made

17  a year in '18, and then she was fired.  So it had to

18  be 2017 I stepped up to interim position of manager,

19  like, January of 2017.  Our manager left.  They asked

20  me if I would serve as an interim.  I went from

21  interim -- when we hired a new director in March, she

22  came on board two weeks later and said why is he

23  interim, let's make him permanent.  So I think I

24  stepped into that role permanently April or May



1    of 2017.

2    Q.          So is it fair to say that you've been

3    acting in this position since January of 2017?

4    A.          Yes.

5    Q.          Have you ever received a phone call from

6    Dr. Sonya Williams requesting to be placed on the

7    reemployment list?

8    A.          No.

9    Q.          If you had received a phone call or an

10   e-mail or any other communication from Dr. Williams or

11   any other teacher about being placed on the

12   reemployment list, how would you have handled it?

13   A.          I would have done my due diligence in

14   making certain that this person was excessed, and then

15   we would have placed her on the list and began the

16   possess of sending her out for positions that she'd

17   applied for.

18              This has happened from time to time.  We

19   do have individuals that contact our office by way of

20   the union sometimes that will get involved.  We've had

21   just recently an Ed assistant that was let go about

22   two years ago; and she came back, she's not on a

23   reemployment list obviously, but she's one saying,

24   hey, I was excessed, I never was able to get into --



1    get back into the system, I've been applying and been

2    applying.

3              And then I was able to pull her to the

4    side and say, okay, I see in the system where you were

5    excessed and you were not successful in finding a job

6    that year, we did RIF that year, you've been gone for

7    two years, we would love to work with you because we

8    have some individual vacancies in your area, but I

9    can't guarantee employment for you.  She said, well,

10   I've applied for several years and I've still not been

11   able to get on, what's going on.

12             And I was able then at that point to

13   counsel her and let her know that at any given point

14   we may have in excess of two hundred, three hundred

15   applicants for one position.  So there is no guarantee

16   that a person just because they apply that they're

17   able to secure a position, because it's so competitive

18   in some of these areas.

19             So having said that, I still would work

20   with her, have my team of individuals -- give her name

21   to the recruiters and say, hey, while you're sending

22   these individuals out for interviews, send this

23   individual out as well.

24   Q.        Okay.  Got you.  Has Dr. Williams ever



1   called you?

2   A.          No, no.  I have not received a call from

3   her.

4   Q.          So has anyone on behalf of Dr. Williams

5   ever called and asked for you to place her on a

6   reemployment list or asked if she's on a reemployment

7   list?

8   A.          No, other than just Jennifer Ervin just,

9   you know, three weeks ago asked me if that name was on

10  the reemployment list, and I told her no.

11                  MR. McGAHA:  Okay.  Which

12              exhibit do we have this one marked as?

13              Have you entered this one (indicating)?

14                  MS. LUNA:  Yes, we did; and it

15              was an exhibit that was marked in Chantay

16              Branch's, and then I had it remarked in

17              this one.

18                  (Off the record discussion.)

19                  MR. McGAHA:  I'm referring to

20              the document that has been pulled in this

21              case, Document 59-2, it's marked starting

22              with page I.D. 1698.  This is a document

23              that Ms. Luna has entered into the record

24              in both Chantay Branch 's deposition and



1               then in this one.

2   BY MR. McGAHA:

3   Q.          And this purports to be at least on the

4   last few pages a list of positions for which

5   Dr. Williams, Sonya Williams has applied.

6               Now, before we look through this list,

7   you testified earlier that the reemployment list is

8   for teachers, that's what -- you work with teachers to

9   place them on the reemployment list.  What do you mean

10  by that?

11  A.          Well, primarily I staff -- we have -- we

12  have a team that staffs Central Office positions, and

13  we have a team that staffs school based positions.  My

14  charge with my six business partners is to work with

15  the principals who are school based positions.  So

16  anything in their building that is school based

17  related, that's what we work to help them staff.

18              For the reemployment list, traditionally

19  the reemployment list contains individuals who by

20  statute of Tennessee, State statute we are required to

21  keep those individuals who are teachers on that

22  roster.  That's why this is not a reemployment list

23  that I -- Exhibit 6, because it has on there people

24  who are nonteachers.



1              That's just my list of names; but if I

2    were to have a traditional reemployment list, it would

3    have only teachers and teacher types.  Teacher/teacher

4    types would be, like, a counselor, it could be -- it

5    could even be an assistant principal with an

6    endorsement, because most assistant principals have a

7    teaching endorsement, a classroom teaching

8    endorsement.

9              So, to clarify, it would be a list of

10   classroom teachers and their endorsement areas so that

11   we could try to get them into positions of classroom

12   teaching positions.

13   Q.            Okay.  So when you say -- you don't call

14   it a reemployment list, because it contains people in

15   addition to teachers?

16   A.            Uh-huh (affirmative).

17   Q.            So what you're saying is it's sort of --

18   it's a reemployment list with other people on it as

19   well; is that what you're --

20   A.            (Interposing.)  Yes and no.  Again, it's

21   not really -- because none of these people -- aside

22   from possibly Ms. Williams, the rest of them are not

23   -- have not been released from the District.  They

24   have not been RIFed.  So that's why I'm --



1    Q.              (Interposing.) Right.

2    A.              That -- again, that -- that exhibit is

3    merely my Excel file that it now, hindsight, looking

4    back, since everything is public record, I probably

5    wouldn't put all the comments that I would put on

6    there just for my own personal record, because at any

7    given point it could be misconstrued.

8                    So it's not a reemployment list.  It's

9    just a list of names of people that I need to keep up

10   with.

11   Q.              And there are people on there who are

12   currently employed with the District?

13   A.              Yes.

14   Q.              That's why it's not really a reemployment

15   list?

16   A.              Exactly.

17   Q.              Because people are still employed with

18   SCS?

19   A.              Yes.

20   Q.              Okay.  Got it.  So you testified I

21   believe that the reemployment list and teachers on

22   that list are placed in vacancies that are classroom

23   based, teacher based positions; is that accurate?

24   A.              Say that once again.



1    Q.              Are -- what types of positions are

2    teachers on the reemployment list placed in?

3    A.              Classroom teaching positions or classroom

4    -- they are teacher and teacher types.  So there may

5    be a kindergarten teacher who lost their job but they

6    have -- when I say lost, they were reduced; and they

7    got on the reemployment list, because we RIFed that

8    year; and as a result we looked at her endorsement,

9    and she not only has a K-3 endorsement, but she also

10   has a library endorsement.  So we would open the door

11   for her to be able to do those two types of -- you

12   know, we'd send her out for those types of vacancies.

13   Q.              So if, for example, you said -- stated

14   earlier that you were a principal?

15   A.              Yes.

16   Q.              Or have been a principal?

17   A.              Yes.

18   Q.              What is your underlying certification in?

19   A.              English 7-12.

20   Q.              Okay.  Is a principal position considered

21   a teacher -- a teaching position?

22   A.              No.

23   Q.              Okay.  So if you -- hypothetically if you

24   were excessed and then subsequently subjected to a

